Karl Blaise STOCKTON, by his mother, Keri STOCKTON, Plaintiffs,

v.

**BARBOUR COUNTY BOARD OF EDUCATION, William Phillips, Superintendent, Defendants.**

Civ. A. No. 2:94–CV–85.

United States District Court, N.D. West Virginia.

March 8, 1995.

Nancy A. Dalby, Braun A. Hamstead, Hamstead & Associates, L.C., Charles Town, WV, for plaintiffs.

Claudia W. Bentley, Bowles, Rice, McDavid, Graff & Love, Martinsburg, WV, for defendants.

### MEMORANDUM OPINION AND ORDER

KEELEY, District Judge.

This case is brought pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* It is now before the Court on the plaintiffs' motion for injunctive relief requesting that the defen-

dants Barbour County Board of Education ("Board") pay over to The Pathway School ("Pathway"), where Blaise Stockton has been educated since September, 1994, monies which were earmarked for his education in the public schools of Barbour County, West Virginia. Blaise has been threatened with discharge from Pathway because his tuition bill has not been paid. For the reasons stated on the record at the hearing on March 2, 1995 and restated below, the Court grants the requested relief.

## I.

Karl Blaise Stockton ("Blaise"), who is currently seventeen years old, suffers from a number of disabilities including Tourette's Syndrome,[1] Obsessive–Compulsive Disorder, Behavior Disorder, and Attention Deficit Hyperactivity Disorder. He also had certain specific learning disabilities particularly related to spelling and mathematics. Blaise consequently has low self-esteem, becomes easily frustrated and depressed, to the point of being suicidal, and has developed a school avoidance problem.

Blaise's school experience has been varied in that he has been in public school, private school and home teaching in several locations during his young life. His mother has taught him through the equivalent of the sixth grade and he attended seventh grade at Philip Barbour Middle School in Barbour County. He received special education with some regular classes in seventh grade, but was receiving F's in many of his classes. However, he was socially promoted. With the same teacher for eighth grade, Blaise's school avoidance problems substantially increased, and in the first nine week period that year, he missed 26 days. In October, 1992, the school com-

mittee for Blaise reviewed his educational plan ("IEP") and recommended a psychiatric evaluation and a meeting between Blaise and the attendance officer. However, the psychiatric evaluation never took place, and rather than meeting with Blaise, the attendance officer sent a letter to Blaise's grandparents, with whom he lived,[2] threatening them with prosecution for Blaise's unexcused absences.

On November 18, 1992, Blaise was involuntarily admitted to Chestnut Ridge Hospital for psychiatric care after he threatened his mother and brother, and attempted to harm himself. Part of the hospitalization involved a half-day school program in a structured environment and Blaise responded well. The Medical Director and Adolescent Education director of that facility recommended that Blaise's schooling continue in a center specializing in dyslexia, noting that he had done well in the structured environment with reinforcement of rules, consistent limit setting with consistent consequences.

At the next IEP meeting, in January, 1993,[3] Keri Stockton, Blaise's mother, requested that he be placed in a residential setting. It was not discussed, and at a subsequent meeting, was discussed only briefly. The IEP developed from these two meetings included part-time placement at the county high school, with LD English, LD skill development, and regular education in practical science and driver's education. Regular math education was to be added later. At Blaise's grandmother's suggestion, the IEP included provision of a tape recorder and computer, assistance with spelling by underlining incorrect words, an LD teacher for oral reading of tests and weekly reports covering attendance and work completion. Blaise attended school only nine days after

---

1. Tourette's syndrome is a neurological disorder marked by muscular jerks (a form of tics), involving the face, shoulder and limbs, accompanied by utterances of obscenities and echolalia. 2 Schmidt's Attorney's Dictionary of Medicine G–68.

2. Blaise's grandparents, Drs. Karl and Mary Myers, lived a short distance from Blaise's mother. He lived with them because his little brother, who is asthmatic, was affected by Blaise's cigarette smoke.

3. The defendants have described another meeting in January, 1993, an Inter–Agency Planning and Placement Committee meeting ("IPPC") during which several options were suggested to Ms. Stockton including the provision of an intensive case manager to assist the family residentially, a group home or foster family placement for Blaise while he attended public schools or placement at Pressley Ridge. The parent investigated Pressley Ridge and found that it did not accept neurologically impaired children. She did not investigate the other options.

March 8, 1993. On April 15, 1993, Ms. Stockton requested permission to home school Blaise. This was approved without an IEP review meeting and no special education services were offered to augment the home schooling.

Keri Stockton requested a due process hearing on August 31, 1993, alleging that the Barbour County Schools had failed to provide Blaise with a free appropriate public education and that the March 1993 IEP was not reasonably calculated to provide him with an educational benefit.

To allow appropriate testing, Ms. Stockton and the school system agreed to extend the time, and a hearing date was set for December 13, 1993. Ms. Stockton obtained a complete multi-disciplinary assessment by the Child and Adolescent Associates in Pennsylvania, a neurological examination, a neuropsychological examination and testing by Pathway. Each of these evaluators recommended that Blaise should be placed in a residential setting, and advised that he was likely to be harmed by placement in the public school. However, the county's school psychologist, Dr. Elizabeth Mason, reported that Blaise's educational needs could be met through the public schools, and a psychiatrist from Virginia who had reviewed Blaise's file but had not personally evaluated him, testified at the due process hearing that Blaise could be educated in an environment less restrictive than a residential school with intensive counseling, peer group enhancement and wrap-around services such as assistance at home and supervision of after school activities. He further testified that he was not familiar with what was available in the Barbour County Schools and his recommendation was based on what is ideally available in public schools.

In a decision dated May 17, 1994, Hearing Examiner Terry D. Blackwood concluded that Blaise did not, at that time, require residential placement assuming that the county could provide certain quality services in a less restricted environment. He directed the county to convene an IEP Committee within 20 days to comprehensively consider the educational alternatives and to arrive at an IEP that minimally included school aver-

sion therapy by a qualified professional, instructors trained or educated in Tourette's Syndrome, and other counselling as necessary by an agent independent of the county schools. If these services could not be provided or were ineffective, the Committee was to seriously consider residential placement in order to provide an educational benefit to the child.

The school system convened an IEP Committee meeting on June 6, 1994, the twentieth day after the Hearing Examiner's decision. No decisions were reached, and the meeting was reconvened on June 20. Again no decisions regarding related services were reached, and the Committee, over the Stocktons' objections, decided to terminate the meeting and reconvene on July 13.

On June 24, 1994, Ms. Stockton enrolled Blaise in Pathway for the 1994–95 school year and requested a due process hearing based on the futility of the IEP process, after the May 17, 1994 decision. On July 8, 1994, she filed Civil Action No. 2:94–CV–85, raising these same issues.

The second due process hearing was held August 4–5, 1994 with the decision issued August 22, 1994. Hearing Examiner Anne Werum Lambright found that the decision that Blaise did not require residential placement was res judicata pursuant to the May 17, 1994 decision, that the unilateral placement in Pathway was unjustified. The Hearing Examiner ordered that the Committee complete Blaise's IEP as directed in the May 17, 1994 decision before the first day of the new school year.

The IEP dated August 26, 1994, included placement in the Barbour County schools with 57 percent of Blaise's school time in regular education, therapy for Blase and his mother, school aversion/phobia therapy to be provided by psychologist John Balchunas or psychiatrist Dr. William Fremow, and provision of a tape recorder, calculator, taped books and a lap top computer with word processing and other specialized software. Ms. Stockton contacted both of the named service providers, each of whom indicated that Barbour County schools had not contacted him and that he was unwilling to provide

the counseling. Mr. Balchunus further stated that such counseling would be inappropriate and that after evaluating Blaise, he believed he should be educated in a residential facility.

Blaise began the school year at Pathway on September 8, 1994, and all reports are that he is doing well with excellent grades and attendance with no school aversion. He has regained IQ scores to the superior range and has been involved with the local emergency squad and a volunteer youth group.

Blaise's mother and grandparents apparently paid for part of Blaise's tuition, but have not been able to keep up. On February 21, 1995, Ms. Stockton received a fax from Pathway indicating that unless the account was brought up to date within 10 days, services would be discontinued. The past due amount was $15,632.80.

As part of Barbour County's application for state and Federal Entitlement Funds for the Education of Exceptional Children filed on June 28, 1994, the school system sought $24,747 to implement an IEP for Blaise Stockton with therapy and psychological services and staff development regarding Tourette's Syndrome. The grant was approved which allows the school system to build the allotted money into the budget, and the school system is reimbursed for money spent at the end of the quarter. Apparently monies that had been earmarked for Blaise, to the extent it can be tracked, has been spent on attorney fees.

## II.

The Individuals with Disabilities Education Act (formerly the Education for Handicapped Children Act), 20 U.S.C. § 1400 *et seq.* was enacted "to assure that all children with disabilities have available to them ... a free appropriate public education ... designed to meet their unique needs...." 20 U.S.C. § 1400(c). States, and through them Boards of Education, receive monies from the Federal Government to accomplish this purpose. To be entitled to the funds, states must establish, *inter alia,* procedures

> to assure that, to the maximum extent appropriate, children with disabilities, in-

cluding children in public or private institutions or other care facilities, are educated with children who are not disabled, and that special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily....

20 U.S.C. § 1412(5)(B).

For each such child, school boards must develop an Individual Educational Plan ("IEP") reasonably calculated to enable the child to receive "educational benefits," *Board of Educ. v. Rowley,* 458 U.S. 176, 207, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982). An important factor in determining educational benefit is "the achievement of passing marks and advancement from grade to grade." *Id.* at 207, n. 28, 102 S.Ct. at 3051, n. 28. A school system does not "discharge its duty under the Act by providing some minimal academic advancement, no matter how trivial." *Hall, ex rel. Hall v. Vance County Bd. of Educ.,* 774 F.2d 629, 636 (4th Cir.1985).

Further, when judicial review of the findings of the due process hearing officer is sought pursuant to 20 U.S.C. § 1415, a "stay-put" provision is invoked, requiring that the child remain in his current educational placement until all such proceedings are completed. 20 U.S.C. § 1415(e)(3).

### B.

To determine whether the plaintiff is entitled to a preliminary injunction, the Court must consider the following four factors set out in *Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189, 193–96 (4th Cir.1977): (1) the likelihood of irreparable harm to the plaintiff without the injunction; (2) the likelihood of harm to the defendant with an injunction; (3) the plaintiff's likelihood of success on the merits; and (4) the public interest. Under the *Blackwelder* test, "the District Court must first compare the likelihood of irreparable harm to the plaintiff with the potential harm the defendant will experience from the grant of preliminary injunctive relief." *Merrill Lynch, Pierce, Fenner &*

*Smith, Inc. v. Bradley,* 756 F.2d 1048, 1052 (4th Cir.1985).

### III.

There is no doubt that Blaise is an individual with disabilities within the meaning of the Act and that he is entitled to a free, appropriate education consistent with these disabilities. In light of the principles stated above, the inquiry before the Court as to IDEA is as follows: (1) what is Blaise's current educational placement for purposes of the "stay-put" clause; (2) what is the likelihood that the plaintiff can show that the public education proposed by the Board was inappropriate; and (3) whether the private school placement is appropriate under the Act. Then, the Court must balance the likelihood of irreparable harm to each side, and consider the public interest.

### A.

■ The defendants argue that the "stay-put" provision requires that Blaise remain in home schooling as he was in April 1993 when the due process procedures were invoked, or be placed in a public school program until the completion of all proceedings, citing 34 C.F.R. § 300.513(b). There are several problems with this approach. First, the regulation requiring placement in the public schools, as the defendants acknowledge, requires the consent of the parents. Here, that will not happen. Ms. Stockton is adamant that the public school placement has significantly harmed Blaise. Second, the home schooling occurred in April, 1993, because of the dismal failure Blaise was experiencing in the public school after his hospitalization at Chestnut Ridge. It is uncontested that there was no IEP in place for the home schooling and no special services were offered to assist Blaise in his studies or in his returning to public school. Third, one of the major issues in the due process hearing which began in December 1993 was whether the Hearing Officer had authority to act since Blaise was not enrolled in the county school system. It seems disingenuous to argue that there is no duty to the child because he is home schooled and to subsequently argue that the home schooling is a current

educational placement for purposes of IDEA. The term "free appropriate public education" is defined at 20 U.S.C. § 1401(a)(18) as having been "provided at public expense, under public supervision and direction" and "provided in conformity with the individualized education program." Blaise's home schooling, after he had been determined to be eligible for services under IDEA, failed on both counts.

■ The plaintiff argues that Pathway is Blaise's current educational placement. However, the enrollment there in the summer of 1994 occurred after the plaintiff had begun administrative proceedings, in fact, after Hearing Officer Blackwood's decision and during the school board's efforts to develop an IEP consistent with that decision. The "stay-put" clause applies to both administrative and judicial proceedings 34 C.F.R. § 300.513(a).

The Court concludes that at the time of the Hearing Examiner's decision in May 1994, there was no "current educational placement" for Blaise. Indeed, there had not been such a placement for over a year that provided Blaise with the free appropriate public education required by law.

Further, the IEP that was developed in the summer of 1994 was not in place until August 26 and although it listed providers for the services required by the Hearing Examiner, those providers had not been contacted by the school and later refused to participate. The Board had applied for state grants to place Blaise in the Barbour County schools in June, 1994, even though they had not yet completed the eligibility and educational criteria analysis that would determine placement. The Court can only conclude that the Board had no intention of giving substantive consideration to the placement in a residential school as required by the Hearing Examiner's order and had decided to give only lip service to meeting the Hearing Examiner's conditions for placement in public schools.

■ Blaise has been placed by his parent at Pathway since September, 1994. The evidence adduced at the hearing, on March 3, 1995, revealed that he is succeeding there

and that it would be harmful to him emotionally and educationally to move him out of that school even temporarily, at this time. The Court therefore concludes that although Pathway was not the "current educational placement" at the beginning of the administrative process, none existed. Pathway must therefore be the "present educational placement" and the "stay-put" provisions of IDEA apply to Pathway.

### B.

■ The Court must now consider whether the plaintiffs have a likelihood of success on the merits as to whether the placement of Blaise in the Barbour County schools would violate IDEA and whether the placement at Pathway is appropriate under the Act. The evidence elicited to date, which includes the transcript of the first due process hearing with all of the expert reports, shows that while in public school, under two IEPs approved by the parent, Blaise received increasingly poor grades, decreased IQ scores and began avoiding school, with severe attendance problems. As discussed above, the IEP process after the Hearing Examiner's decision was apparently not done in the spirit of that decision and at the beginning of the school year, the support system Blaise would need to succeed did not appear to be in place. If Blaise did not attend school, or was not given the specialized help that everyone agrees he needs, he would not likely advance academically or receive the educational benefit to which he is entitled.

The Board argues that public placement is appropriate because it is the least restrictive environment, and allows "mainstreaming" of Blaise with non-disabled students. However, as the Fourth Circuit Court of Appeals pointed out in *Carter v. Florence County School Dist. Four*, 950 F.2d 156 (4th Cir.1991), *aff'd* —— U.S. ——, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993),

> [m]ainstreaming is a policy to be pursued so long as it is consistent with the Act's primary goal of providing disabled stu-

dents with an appropriate education. Where necessary for educational reasons, mainstreaming assumes a subordinate role in formulating an educational program.

*Id.* at 160.

■ Here, every expert but one who examined Blaise, including neurologists, neuropsychologists, psychiatrists and psychologists, concluded the Blaise would not only benefit from residential placement but would be harmed by public school placements. The one exception was Dr. Elizabeth Mason, the school psychologist for Barbour County. The Court acknowledges that further inquiry must be made on this issue, *see DeVries v. Fairfax County*, 882 F.2d 876 (4th Cir.1989), but finds in light of the above factors that the plaintiff has a likelihood of prevailing on the merits in establishing that the public school system has failed to meet Blaise's needs in the past, and that the IEP developed was not reasonably calculated to provide him with a free and appropriate education.

As to the likelihood the plaintiffs can show that Pathway is an appropriate placement, the Court relies on the testimony of Dr. Harry Johnston, a clinical and school psychologist at Pathway who is Blaise's therapist and case manager. He testified that Blaise has been attending school regularly, that he is achieving academically, socially and vocationally. He further testified that due to time constraints, Pathway began the school year with the IEP from Barbour County and found that Blaise promptly met many of the goals stated, especially in math, where he achieved the goal within one week.[4] Except as to the least restrictive environment issue, the Court finds that Pathway is providing an appropriate education for Blaise.

### C.

■ In balancing the harms, the Court finds that there will be irreparable harm to Blaise if the injunction is not issued in that he will be removed from the first school

---

4. Counsel for the defendants argued that Pathway took just as long as Barbour County, about three months, to develop an IEP for Blaise. However, Barbour County was under a mandate to produce the IEP within 20 days of the Hearing Examiner's order and it already had all of the reports of Blaise's problems. At the end of August, it still did not have the support services required. Pathway already had such services in place.

setting where he has achieved and not failed, and that for the short term, at least, probably through the end of this school year, he would be back in an environment where, he told Dr. Johnston, he would "get his butt kicked" by his peers. He has difficulty adjusting to new situations and does not have the skills to succeed in a non-structured setting.

■ The harm to the Board is financial. It does not at this time have the grant money allotted to Blaise and will have to pull the funds from some other part of the budget. It is likely, however, that the State will eventually reimburse these funds, and it receives money from the Federal government to do so. Thus, any harm to the Barbour County Board of Education is not irreparable.

■ As to the public interest, the court is cognizant of and concerned about the fact that Pathway is an extremely expensive placement for a young man whose family has far more income than 99 percent of the people in Barbour County. Funds for education are very tight and the amount of money involved here could benefit numerous children in the school system. However, the Individuals with Disabilities Education Act requires that all children with disabilities, including Blaise, are entitled to a free and appropriate public education. The public interest in upholding the Act outweighs the strain on the Board's budget.

### D.

Fed.R.Civ.P. 65 requires that

No injunction shall issue except upon the giving of security by the applicant in such sum as the Court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

■ The Board requests that the security be, dollar for dollar, in the amount of the tuition it may be required to pay, but the Court must consider whether such a bond would act to prevent implementation of the Court's order due to inability to provide such a bond. Blaise's mother, Keri Stockton, is now employed and earning approximately $2,000 a month net. It further appears that Dr. Carl Myers and Dr. Mary Elizabeth Myers are gainfully employed physicians in Barbour County and Dr. Mary Elizabeth Myers may be gainfully employed as a physician in Upshur County. Further, even taking into consideration payments to the IRS which the Myers are now making in the amount of $1,700 per month which will soon increase to $2,000 a month, and taking into consideration further their reduction in income because Dr. Myers is no longer working in the emergency room at the hospital in Philippi, and Dr. Mary Myers has lost a $13,000 contract with the Summit Center, nevertheless, it appears that the Myers' and Ms. Stockton are able to pay some bond.

The Court deems the sum that is proper to be $10,000, which may be secured by a bond through a bonding company, by tendering of property owned by the Myers or Ms. Stockton, or by tendering cash. The bond must be posted no later than Friday, March 10th. If the bond is not posted at that time, this Court will vacate its order.

It is, therefore, ORDERED that the plaintiff's motion for preliminary injunction is GRANTED, Blaise Stockton should not be discharged from Pathway and the cost of his schooling for the remainder of the academic year is to be borne by the Board pending a final decision in this case.

It is further ORDERED that the plaintiff's oral motion to consolidate this case with Civil Action No. 2:94–CV–220 is hereby GRANTED, that the defendants' motion to continue the trial set for April 3, 1995 is GRANTED and this case will be set for trial during the summer of 1995. The plaintiff's oral motion to dismiss all counts of the complaint except those brought pursuant to 20 U.S.C. § 1400 *et seq.* is GRANTED, the plaintiff's motion for additional evidence is GRANTED to the extent the evidence relates to the appropriateness of the IEPs involved herein. There will be no further discovery in this matter until the court has resolved the pending motion for summary judgment.

It is so ORDERED.