Daniel G. WAGNER, Jr., et al.

v.

BOARD OF EDUCATION OF
MONTGOMERY COUNTY,
MARYLAND, et al.

No. CIV.A.DKC 2002–0763.

United States District Court,
D. Maryland.

April 25, 2002.

Kerry Lynn Edwrds, Nick S. Williams, Mayer Brown Rowe and Maw, Washington, DC, for Regina Wagner.

Jeffrey A. Krew, Columbia, MD, for Board of Educ. of Montgomery County, Montgomery County Public Schools, Jerry D. Weast.

Wayne Darryl Steedman, Callegary & Steedman, PA, Baltimore, MD, for Christine Caselles.

### MEMORANDUM OPINION

CHASANOW, District Judge.

Daniel Wagner, an autistic child who is now six years old, was without educational services for over four months despite the existence of an Independent Educational Plan ("IEP") that provided for the County to provide 30 hours of in home applied behavioral analysis ("ABA"). The reasons for this unfortunate situation are complex and the remedy has proven elusive. Nevertheless, based on the evidence presented over two days of hearing in this court (and review of evidence presented during a lengthy ongoing due process proceeding)

and the court's interpretation of the applicable law, I conclude that the County has failed to provide an acceptable "stay put" placement and will be ordered to propose a new alternative promptly. I will not, however, order that the Autism Learning Center be the "stay put" placement or direct the County to reimburse the Wagners for those services at this time.

## I. Statutory Framework

The Individuals with Disabilities Education Act ("IDEA"), known originally as the Education of the Handicapped Act, was enacted in order "to assure that all children with disabilities have available to them ... a free appropriate public education [ ('FAPE') ] which emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(c). To accomplish this objective, the IDEA provides federal money to state and local educational agencies that undertake to implement its requirements. *School Comm. of the Town of Burlington v. Department of Educ.*, 471 U.S. 359, 369, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985), *citing Hendrick Hudson Cent. Sch. Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 179–84, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). To be eligible for federal funding, states and local agencies are required to comply with federal guidelines and regulations established to ensure the availability of a FAPE for all of their disabled children. 20 U.S.C. § 1412.

In order to achieve a FAPE, "[f]or each such child, school boards must develop an Individual Educational Plan ('IEP') reasonably calculated to enable the child to receive 'educational benefits.' " *Stockton v. Barbour County Bd. of Educ.*, 884 F.Supp. 201, 205 (N.D.W.Va.1995), *aff'd*, 112 F.3d 510, 1997 WL 225483 (4th Cir. 1997) (unpublished), *quoting Board of Educ. v. Rowley*, 458 U.S. 176, 207, 102

S.Ct. 3034, 73 L.Ed.2d 690 (1982). "A school system does not 'discharge its duty under the Act by providing some minimal academic achievement', no matter how trivial." *Id., quoting Hall, ex rel. Hall v. Vance County Bd. of Educ.*, 774 F.2d 629, 636 (4th Cir.1985).

The state and local agencies are required to comply not only with the substantive requirements of the IDEA, but also the elaborate system of "procedural safeguards" that the IDEA extends to children with disabilities and their parents. These procedural safeguards are meant to "guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think are inappropriate." *Honig v. Doe*, 484 U.S. 305, 311–12, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988).

Among the procedural safeguards that a state must provide parents is the opportunity to convene "an impartial due process hearing," to resolve their complaints. *See* 20 U.S.C. § 1415(b)(2). Maryland has provided for such hearings to be provided through the Office of Administrative Hearings ("OAH"). As an important adjunct to the safeguard provided by the due process hearing, during the pendency of the hearing or "when judicial review of the findings of the due process officer is sought pursuant to U.S.C. § 1415, a 'stay put' provision is invoked, requiring that the child remain in his current educational placement until all such proceedings are completed." *Stockton*, 884 F.Supp. at 205.

The "stay-put" provision of the IDEA is 20 U.S.C. § 1415(j), which states:

Except as provided in subsection (k)(7) of this section, during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in

the then-current educational placement of such child, or, if applying for initial admission to a public school, shall, with the consent of the parents, be placed in the public school program until all such proceedings have been completed.

This provision, "represents Congress' policy choice that all handicapped children, regardless of whether their case is meritorious or not, are to remain in their current educational placement until the dispute with regard to their placement is resolved." *Drinker v. Colonial School Dist.*, 78 F.3d 859, 864–65 (3rd Cir.1996). This " 'stay-put' provision affords an 'automatic' preliminary injunction to maintain the child's placement, eliminating the need for parents to make the usual showing required for obtaining preliminary injunctive relief." *Board of Educ. Of Montgomery County v. Brett Y.*, 959 F.Supp. 705, 709 (D.Md.1997), *citing Honig*, 484 U.S. at 326, 108 S.Ct. 592.

When the current placement is unavailable in order to comply with the "stay put" provisions, the county is obligated to provide an alternative placement that is a comparable program, capable of implementing an IEP that does not constitute a change in placement. "The IDEA does not define what constitutes a 'change in placement' " *Cavanagh v. Grasmick*, 75 F.Supp.2d 446, 466 (D.Md.1999), *citing Honig v. Doe*, 484 U.S. 305, 326, 108 S.Ct. 592 (1988). Neither the Supreme Court nor the Fourth Circuit has specifically reached this issue. Despite some discrepancies, certain generally consistent principles have emerged from cases in a number of other circuits. "[A] fundamental change in, or elimination of a basic element of, the education program, which adversely affects the child's learning experience in a significant way, is what constitutes a 'change in education placement' for purposes of the IDEA." *Cavanagh*, 75

F.Supp.2d at 469; *see also Board of Educ. Of Comm. High School Dist. No. 218, Cook County v. Illinois State Bd. of Educ.*, 103 F.3d 545, 549 (7th Cir.1996) (adopting "fact-driven approach" of sister circuits); *Tennessee Dep't of Mental Health and Mental Retardation v. Paul B.*, 88 F.3d 1466, 1474 (6th Cir.1996); *Sherri, A.D. v. Kirby*, 975 F.2d 193, 206 (5th Cir.1992); *DeLeon v. Susquehanna Comm. School Dist.*, 747 F.2d 149, 152 (3rd Cir.1984); *Lunceford v. District of Columbia Bd. of Educ.*, 745 F.2d 1577, 1582 (D.C.Cir.1984).

In *Cavanagh*, the court fleshed out what constitutes a "fundamental" change to a basic element of the placement with reference to U.S. Dept. of Educ., Office of Special Education Programs (OSEP), Policy Letter to Fisher, 21 IDELR 992, 995 (April 18, 1994). *Cf. Honig*, 484 U.S. 305, 326 n. 8, 108 S.Ct. 592. In that letter, OSEP concluded that whether a change in education placement has occurred turns on "whether the proposed change would substantially or materially alter the child's educational program." Policy letter, 21 IDELR at 995. According to that letter, the court should consider:

(a) whether the educational program set out in the child's IEP has been revised; (b) whether the child will be able to be educated with non-disabled children to the same extent; (c) whether the child will have the same opportunities to participate in non-academic and extracurricular services; and (d) whether the new placement option is the same option on the same continuum of alternative placements.

*Cavanagh*, 75 F.Supp.2d at 468; *see also Henry v. School Administrative Unit # 29*, 70 F.Supp.2d 52, 59 (D.N.H.1999)(analyzing "stay out" claim under OSEP guidelines).

## II. Background

Daniel Wagner turned six years old on January 19, 2002. For the year, July 2, 2001–June 30, 2002, he was receiving special education services based on an IEP agreed to by all parties at a meeting held on March 8, 2001. Daniel was to receive 30 hours of ABA discrete trial instruction, on a 12 month schedule, with occupational therapy on a consultation basis, at a separate Special Education Day School, and was assigned to the Intensive Early Intervention Program at Community Services for Autistic Adults and Children (CSAAC.)

This Lovaas-based[1] applied behavioral analysis one-on-one discrete trial instruction was provided in Daniel's home. Therapists hired and trained by CSAAC came to the Wagner's home, where a separate therapy room had been set up, daily. In addition, the Wagners had arranged for Daniel to continue for another year at preschool and a "shadow" took him to school several days a week for the regular nursery school program.

By October or November, problems were apparent in the relationship between the Wagners and some of the personnel at CSAAC. On November 14, 2001, CSAAC ceased sending people to the Wagner home.

In response to the then apparent unavailability of CSAAC, the County proposed a new IEP at a meeting held November 28, 2001. The proposed IEP contemplated provision of services at Maryvale Elementary School. The Wagners agreed to explore that proposal, and also continued to explore other options with other Lovaas providers, to some extent at the suggestion of and with the blessing of County.

By January, 2002, the Wagners determined not to accept the Maryvale proposal and they initiated due process proceedings.

At that point, all agree that the "stay put" provision of the IDEA became operative. The County attempted to convince CSAAC to provide continuing services as it was obligated to do, without success.

A due process hearing was convened on February 14, 2002 to consider the proposed change in placement for the remainder of the school year. At the hearing, counsel for CSAAC stated that CSAAC was then again willing to provide services to Daniel in the interim, in order to satisfy the "stay-put" provision.

The next day, however, the offer was withdrawn, plunging the situation further into confusion. In a letter dated March 6, 2002, the County then offered the Wagners what has come to be labeled the Maryvale Plus plan, consisting of the proposal for the new IEP that was presented at the November 2001 IEP meeting, augmented with more one on one discrete trial/systematic instruction (to reach a full 20 hours per week) and 10 hours in regular kindergarten at Maryvale, with an instructional assistant, door-to-door transportation, supervision and consultations.

This law suit was filed on March 12, 2002, seeking an order requiring "stay put" and additional services to make up for the time already lost. The court convened a hearing on March 15, 2002, at the time on the request for a temporary restraining order. It quickly became apparent, however, that temporary relief would be ill advised. The parties then attended another IEP meeting concerning "stay put", and conducted two more days of the due process hearing concerning the proposed change to the IEP for the remainder of the school year.

On April 5, 2002, a second hearing was held before the undersigned on the request

1. Dr. O. Ivar Lovaas developed the technique that bears his name.

to order "stay put". By that time, the Wagners had unilaterally arranged for the Autism Learning Center ("ALC"), based in Falls Church, Virginia, to provide educational services in their home, which were to begin that weekend.

On March 19, 2002, CSAAC offered to resume providing services, with a subcontract with an outside behavioral specialist or psychologist, most likely through New Jersey's Lovaas Institute for Early Intervention (LIFE). The Wagners would have to sign a consent form before CSAAC could even contact NJ LIFE to determine if it would participate. The parents declined to accept that proposal as "stay put".

Eileen Fazio, placement specialist with the Montgomery County Schools, testified that an IEP that specifies "intensive early intervention program with ABA discrete trial instruction" can only mean Lovaas, and, accordingly, be implemented only through CSAAC, which is the only state approved licensee. Tr. 168–69. Daniel's IEP required the school system to fund 30 hours of ABA discrete trial. As she explained, the CSAAC clinic program prior to November 17 consisted of 20 hours of ABA instruction and 10 hours of shadowing support at a regular nursery school. The nursery school arrangement had been developed at the March 2001 IEP meeting. The school system had offered to have Daniel go to his home school kindergarten program, with a one on one Lovaas shadow. The parents chose to "waive" the kindergarten option and continue Daniel in pre-school, at their expense, but also with the school funded Lovaas shadow. She said, "there is no transportation written on the IEP. However, there was an assumption on the basis of, I guess, precedent that the Lovaas therapist would provide transportation for Daniel to his preschool." Tr. 96–97. When the County proposed an alternative at Maryvale, it also included 10 hours a week at the regular kindergarten classes with a shadow. Ms. Fazio testified that, although the IEP did not explicitly include that aspect of the program, "if CSAAC had honored their commitment to provide Stay Put, part of that would have been shadowing. Part of that would be an opportunity to have a mainstream experience. And this is our attempt to replicate that." Tr. 134.

Only CSAAC is approved by the State of Maryland to provide in home Lovaas services. (Tr. Ms. Fazio at 165.) Neither New Jersey Life nor The Autism Learning Center is on the approved list. Tr. 83—85, testimony of Dr. Linda Bluth, Chief, Community Interagency Services Branch, Maryland State Department of Education. Currently, in order for either to be paid for services, it would have to function as a subcontractor of CSAAC.

Even Ms. Fazio concluded at the hearing on March 15 that CSAAC's offer to subcontract with New Jersey Life was illogical. Tr. 122.

## III. Questions presented

A. Do the county's two proposed plans (Maryvale plus plan and CSAAC subcontracting with New Jersey LIFE proposal) qualify as comparable alternatives to the "then-current" educational placement for the purposes of the "stay-put" provision of 20 U.S.C. § 1415?

B. Can county be made (at this stage) to reimburse the Wagners for their unilateral placement of Daniel in the Autistism Learning Center (ALC)?

## IV. Analysis

*A. "Stay put"*

■ The difficulty arising in the current case is that Daniel's then-current educational placement, provided by CSAAC,

has been and, as I find, is no longer available for a variety of reasons. The County has come forward with two alternative proposals, purportedly as equivalent services to those he had been receiving from CSAAC. The first proposal, the "Maryvale Plus" plan, involves Daniel's placement into a public school autism classroom. The Wagners contend that this program fails to replicate the fundamental elements of Daniel's former program, specifically the in home services element. As a result, it fails to provide a substantively identical alternative program as demanded by the "stay put" provision in event that the former placement is unavailable. The County has recently come forward with a second proposal, the continuation of services provided by CSAAC, but only upon certain conditions including that the Wagners provide a waiver and some of the services are provided via New Jersey LIFE. The Wagners contend that the CSAAC proposal is inadequate because of the alleged repeated breach of trust by CSAAC and the deterioration of their relationship with CSAAC.

Mrs. Wagner testified that, based on the turbulent relationship with CSAAC, exacerbated by revelations during these proceedings of memoranda written last fall, Plaintiffs cannot continue with CSAAC hired personnel in their home. Their reluctance is well justified. In addition, CSAAC's abrupt termination of services and repeated changes in position on providing "stay put" destroy any reason to rely on CSAAC's promise to provide any services at all. Plaintiffs are not required to allow CSAAC to do what it had a clear obligation to do all along, when it has utterly failed to recognize its obligations to Daniel.

■ The Maryvale proposal is, for different reasons, deficient. "Stay put" requires the continuation of services without a change in placement. A change from a home based program to a school based program, in the middle of a school year, without any transition, is a fundamental change in a basic element of the program, and would adversely affect Daniel's learning experience in a significant way. *See Cavanagh,* 75 F.Supp.2d at 469 (a fundamental change adversely affecting educational experience constitutes a "change in educational placement" and so is not stay-put). Whatever change may be appropriate for the next school year, there is no way that an abrupt change from home to school constitutes stay-put.

### B. Unilateral Placement/Request for Reimbursement

After requesting a due process hearing regarding the county's proposed IEP, and a "stay put" injunction hearing in this court, the Wagners unilaterally placed Daniel in a program run by the Autistic Learning Center (ALC), which is not licensed by the State of Maryland to provide special education services. Parents who believe that their child is being denied a FAPE also may choose unilaterally to withdraw their child from the public school system and place the child in a private institution at their expense. *School Comm. Of Burlington v. Department of Ed. Of Mass.,* 471 U.S. 359, 364–365, 369–370, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985); *see also Board of Educ. of Cabell County v. Dienelt,* 843 F.2d 813, 815 (4th Cir.1988); *Hudson v. Wilson,* 828 F.2d 1059, 1063 (4th Cir.1987); *Hall v. Vance County Bd. of Educ.,* 774 F.2d 629, 635 (4th Cir.1985). In *Burlington,* 471 U.S. at 364–365, the Court recognized the right of parents who disagree with a proposed IEP unilaterally to withdraw their child from a public school and place the child in private school. The Court also held that IDEA's grant of equitable authority empowers a court to

order school authorities retroactively to reimburse the parents if the court ultimately determines that the private placement, rather than the proposed IEP, is proper under the act. *Id.*, 471 U.S. at 364–365, 105 S.Ct. 1996.

In general, a federal court enjoys "broad discretion" in fashioning equitable remedies once it holds that a public placement violates IDEA. *Florence County School District Four v. Carter*, 510 U.S. 7, 15–16, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993) (clarifying the scope of the court's authority to order reimbursement). In *Florence*, parents of a disabled child were held not to be barred from reimbursement even though the private school did not meet the § 1401(a)(18) definition of a "free appropriate public education" because the requirements of that section "cannot be read as applying to parental placements." *Florence*, 510 U.S. at 13, 114 S.Ct. 361. ("To read the provisions of § 1401(a)(18) to bar reimbursement in the circumstances of this case would defeat this statutory purpose" of ensuring that students receive an education that is both free and appropriate.) The right to reimbursement may be predicated either on substantive or serious procedural violations by the school system. *See. e.g., Board of Educ. of Cabell County v. Dienelt*, 843 F.2d 813, 815 (4th Cir.1988); *Hudson v. Wilson*, 828 F.2d 1059, 1063 (4th Cir.1987); *Hall v. Vance County Bd. of Educ.*, 774 F.2d 629, 635 (4th Cir.1985).

Though parents who unilaterally place their child without the consent of state or local school officials during the pendency of IEP adequacy proceedings are not barred from reimbursement, they do so at their own risk. In *Florence*, 510 U.S. at 15, 114 S.Ct. 361, the court held that parents are entitled to reimbursement *only* if the federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the act. *Id.*

The question here is what discretion does a federal court have to order reimbursement at the "stay put" injunction stage, even if, as here, it holds that the county failed to comply with the "stay put" provisions. The court has found merely that the current proposals are not the same as the then-current placement for the purposes of stay-put. The proceedings to determine whether the proposed new IEP is FAPE under the IDEA are ongoing and the issue of whether the ALC placement would be FAPE under the act is not yet before this court. At the preliminary injunction stage, the two conclusions required by *Florence* for reimbursement have not been made by the court. Further, I can find no cases in which the court reimbursed plaintiffs for unilateral placement at the "stay put" stage. In *Monticello School District No. 25 v. George L.*, 102 F.3d 895, 904–905 (7th Cir.1996), the court did uphold the reimbursement of parents for their unilateral removal and placement in a program. However, it did so only after the administrative hearing officer found the placement to be appropriate under *Burlington*.

Reimbursement is not appropriate at the "stay put" stage where neither of the determinations required by *Burlington* and *Florence* have yet been made.

## V. Conclusion

For the reasons stated, Plaintiffs' motion for a preliminary injunction is granted in part and denied in part. The court finds that the County is not providing and has not proposed a proper "stay put" placement for Daniel. It will be ordered to do so. On the other hand, there is insufficient information before the court to find that the ALC program, unilaterally chosen by Plaintiffs, either provides an

equivalent program or is the only available alternative. Thus, the court will not order the County to reimburse Plaintiffs for those expenses at this time.

### ORDER

For the reasons stated in the foregoing Memorandum Opinion, it is this _____ day of April, 2002, by the United States District Court for the District of Maryland, ORDERED that:

1. Plaintiffs' motion for a preliminary injunction BE, and the same hereby IS, GRANTED as follows: Defendants are hereby ORDERED to propose another at home alternative for a "stay put" placement that does not involve CSAAC within 15 days;

2. Plaintiffs' motion for a preliminary injunction BE, and the same hereby IS, DENIED as follows: Defendants are not, at this time, required to reimburse Plaintiffs for the ALC program; and

3. The clerk will transmit copies of the Memorandum Opinion and this Order to counsel for the parties.