**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DANIEL G. WAGNER, JR., a minor
child acting by and through his
parents Daniel Wagner and Regina
Wagner; DANIEL WAGNER; REGINA
WAGNER, in their individual
capacities,

              *Plaintiffs-Appellees,*

       v.

BOARD OF EDUCATION OF
MONTGOMERY COUNTY; MONTGOMERY
COUNTY PUBLIC SCHOOLS; JERRY D.
WEAST, in his official capacity as
Superintendent of Schools,
Montgomery County Public
Schools,

              *Defendants-Appellants,*

       v.

COMMUNITY SERVICES FOR AUTISTIC
ADULTS AND CHILDREN,

              *Third Party Defendant,*

CHRISTINE CASELLES, Dr.,

              *Movant.*

No. 02-1564

DANIEL G. WAGNER, JR., a minor
child acting by and through his
parents Daniel Wagner and Regina
Wagner; DANIEL WAGNER; REGINA
WAGNER, in their individual
capacities,

>    *Plaintiffs-Appellees,*

v.

BOARD OF EDUCATION OF
MONTGOMERY COUNTY; MONTGOMERY
COUNTY PUBLIC SCHOOLS; JERRY D.
WEAST, in his official capacity as
Superintendent of Schools,
Montgomery County Public
Schools,

>    *Defendants-Appellants,*    No. 02-2187

v.

COMMUNITY SERVICES FOR AUTISTIC
ADULTS AND CHILDREN,

>    *Third Party Defendant,*

CHRISTINE CASELLES, Dr.,

>    *Movant.*

Appeals from the United States District Court
for the District of Maryland, at Greenbelt.
Deborah K. Chasanow, District Judge.
(CA-02-763-DKC)

Argued: June 3, 2003

Decided: July 7, 2003

Before WIDENER, NIEMEYER, and LUTTIG, Circuit Judges.

Vacated and remanded by published opinion. Judge Luttig wrote the opinion, in which Judge Niemeyer joined. Judge Widener filed a dissenting opinion.

---

## COUNSEL

**ARGUED:** Jeffrey Alan Krew, Columbia, Maryland, for Appellants. Kerry Lynn Edwards, MAYER, BROWN, ROWE & MAW, Washington, D.C., for Appellees. **ON BRIEF:** Lisa L. Levine, MAYER, BROWN, ROWE & MAW, Washington, D.C., for Appellees.

---

## OPINION

LUTTIG, Circuit Judge:

In this case we are called upon to interpret 20 U.S.C. § 1415(j), the so-called "stay put" provision of the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400, *et seq.*

Daniel Wagner is an autistic child covered by the IDEA. Prior to the initiation of this suit, Daniel was receiving at home Lovaas therapy pursuant to an Individualized Educational Program (IEP) prepared by the Board of Education of Montgomery County (the "School Board") and agreed to by his parents. Trouble arose when the Lovaas service provider identified in the IEP, Community Services for Autistic Adults and Children (CSAAC), stopped providing services. The School Board proposed a new IEP and the parents commenced due process proceedings, challenging the proposed IEP. While those proceedings were ongoing, the parents also sought an injunction under section 1415(j) in district court. The district court reasoned that because Daniel's current placement was unavailable, due to the unwillingness of CSAAC to provide services, the School Board was required to propose an alternative, equivalent placement to satisfy the "stay put" provision. Because we conclude that the district court erred in its interpretation of section 1415(j), we vacate the district court's orders and remand for further proceedings.

I.

Daniel Wagner is now seven years old. For the year beginning on July 2, 2001 and ending on June 30, 2002, Daniel was receiving special education services based on an IEP agreed to by all parties at a meeting held on March 8, 2001 (the "March 8 IEP"). The March 8 IEP provided that Daniel was to receive 20 hours of in home ABA discrete trial instruction (*i.e.*, Lovaas therapy) and 10 hours of shadowing support at a pre-school. In addition, the Wagners had arranged for Daniel to continue for another year at a private preschool, even though he was eligible to begin kindergarten at a Montgomery County public school (MCPS).

Problems arose by October or November of 2001, when the relationship between the Wagners and some of the personnel at CSAAC deteriorated. On November 14, 2001, CSAAC ceased sending its employees to the Wagner home, effectively cutting off the provision of services. On November 28, 2001, when it became apparent that CSAAC would not perform as obligated, the School Board prepared and proposed a new IEP for Daniel. The new IEP contemplated provision of services at Maryvale Elementary School (a MCPS school). By January of 2002, the Wagners rejected the new IEP and initiated due process proceedings.

On February 14, 2002, the ALJ conducted a hearing to consider the proposed change in placement for the remainder of the school year. At the hearing, counsel for CSAAC stated that CSAAC was willing to provide services to Daniel in order to satisfy the "stay put" provision of the IDEA. The very next day, however, the offer was withdrawn. In a letter dated March 6, 2002, the School Board then offered the Wagners the "Maryvale Plus" plan, which consisted of the aforementioned new IEP proposal augmented with more one-on-one discrete trial/systematic instruction (to reach a full 20 hours/week) at Maryvale and 10 hours in regular kindergarten at Maryvale, with an instructional assistant.

On March 12, 2002, the Wagners went into federal district court and sought a preliminary injunction to effect their "stay put" rights under the IDEA. The Wagners argued that CSAAC would no longer provide services as it was obligated to do under the March 8 IEP. On

March 19, 2002, CSAAC offered to resume providing services but through a subcontract with an outside behavioral specialist or psychologist, most likely through New Jersey's Lovaas Institute for Early Intervention (New Jersey LIFE). The parents found this new proposal unacceptable.

On April 5, 2002, the district court conducted a hearing and later issued an opinion in which it concluded that "Daniel's then-current educational placement, provided by CSAAC, has been and, as I find, is no longer available." *Wagner* v. *Board of Education of Montgomery County, Maryland*, 198 F. Supp. 2d 671, 675-76 (D. Md. 2002). The then-current placement was unavailable because Lovaas was the only program that would satisfy the requirements of the March 8 IEP, CSAAC was the only state-approved provider of Lovaas services, and CSAAC was not available to provide services. The district court reasoned that "[w]hen the current placement is unavailable in order to comply with the 'stay put' provisions, the [School Board] is obligated to provide an alternative placement that is a comparable program, capable of implementing an IEP that does not constitute a change in placement." *Id.* at 673. The district court then determined that the Maryvale Plus proposal was not comparable. Because there were no other placement proposals before the district court at that time, the district court then issued a preliminary injunction requiring the School Board "to propose another at home alternative for a 'stay put' placement that does not involve CSAAC within 15 days." *Id.* at 678. The School Board appealed that ruling, but also provided the proposal within the specified time. The School Board proposed an in home Lovaas based ABA placement to be administered by New Jersey LIFE, and the district court concluded that that proposal satisfied the "stay put" provision of the IDEA.

At the beginning of the next school year, the Wagners sought to enroll Daniel in kindergarten at a MCPS school for 10 hours a week. The School Board refused to allow them to do so on the grounds that the placement plan implemented pursuant to the district court's injunction did not provide for in school services at the expense of the School Board. The parents went back into court and the district court issued another injunction "clarifying" that the earlier order entered implementing the new proposal required the School Board to provide

in school services. The School Board appealed from that ruling as well and both appeals have been consolidated.

## II.

The IDEA, formerly the Education of the Handicapped Act (EHA), was enacted "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." 20 U.S.C. § 1400(d)(1)(A). To achieve this purpose, the federal government provides funds to the states and local agencies to implement IDEA, on the condition that such states and local agencies comply with its requirements, both substantive and procedural. The primary substantive guarantee of IDEA is the provision of a free appropriate public education, or "FAPE," to children with disabilities. States and local agencies provide FAPE by designing and implementing IEPs for disabled children.

The IDEA also contains several procedural guarantees. If the parents of a disabled child disagree with the IEP proposed by the state or local authority, they may convene "an impartial due process hearing," to resolve their complaints. *Id*. § 1415(f)(1). If any of the parties to the due process hearing are aggrieved by the result of that hearing, the IDEA authorizes the institution of a civil action in federal court to challenge the "findings and decision" made in the hearing. *Id*. § 1415(i)(2)(A).

Perhaps recognizing that these substantial procedural protections could often take a significant amount of time in which to run their course, Congress also saw fit to include in the IDEA a provision dealing directly with the child's placement during the pendency of any proceedings challenging a proposed IEP. That provision is section 1415(j), the "stay put" provision, which reads in its entirety

(j) Maintenance of current educational placement

Except as provided in subsection (k)(7) of this section, *during the pendency of any proceedings conducted pursuant to*

> *this section*, unless the State or local educational agency and the parents otherwise agree, *the child shall remain in the then-current educational placement of such child*, or, if applying for initial admission to a public school, shall, with the consent of the parents, be placed in the public school program until all such proceedings have been completed.

*Id*. § 1415(j) (emphasis added).

This case turns on the meaning of section 1415(j) and the nature of its guarantee. In the typical section 1415(j) case, the school board is attempting to remove the child, whether through expulsion or by other means, from his or her current placement and the parents are seeking to stop that action. This case is atypical in that the School Board is not trying to change Daniel's placement; the placement has simply become unavailable through no fault of the School Board. The district court thought the way to resolve that apparent conundrum was to search for a comparable alternative placement. *See Knight* v. *District of Columbia*, 877 F.2d 1025, 1028 (D.C. Cir. 1989) ("This court has held that if a student's 'then current educational placement' becomes unavailable, [the school board] must provide him with a 'similar' placement pending administrative and judicial approval of its eventual plans.").

On that interpretation of the IDEA the district court based its preliminary injunction, which we are here reviewing. While we normally review the grant of preliminary injunctive relief for abuse of discretion, we review the district court's interpretation of IDEA *de novo*. *See Virginia Carolina Tools, Inc.* v. *Int'l Tool Supply, Inc.*, 984 F.2d 113, 116 (4th Cir. 1993). If the district court's injunction was based on an erroneous interpretation of the statute, it is subject to vacatur by this court.

We hold that the district court did err in its interpretation of section 1415(j). Section 1415(j) provides simply and unequivocally that the child "shall remain" in his or her "then-current education placement" "during the pendency of any proceedings conducted pursuant to this section." 20 U.S.C. § 1415(j). The utility of section 1415(j) is thus easily understood. It guarantees an injunction that prohibits a school board from removing the child from his or her current placement dur-

ing the pendency of the proceedings. The injunction is automatic; the party seeking it need not meet the usual requirements for obtaining preliminary injunctive relief. *See Safety-Kleen, Inc. (Pinewood)* v. *Wyche*, 274 F.3d 846 (4th Cir. 2001). Thus, when presented with an application for section 1415(j) relief, a district court should simply determine the child's then-current educational placement and enter an order maintaining the child in that placement.

The district court apparently believed that type of remedy insufficient in this case. The impetus for the district court's belief was its finding of fact that Daniel's then-current placement was unavailable because CSAAC could not be counted upon to provide services. *See Wagner*, 198 F. Supp. 2d at 675-76. That finding was certainly not clearly erroneous, and we affirm it on appeal. First, it is undisputed that Daniel's then-current placement was the placement established pursuant to the March 8 IEP, including the provision of services by CSAAC. *See* Appellees' Br. at 20 ("There is no dispute among the parties . . . that Daniel's 'then current' placement as of the filing of the due process claim on January 18, 2002 was the Lovaas home-based intensive early intervention program provided by CSAAC."); Appellants' Br. at 17. Second, even though CSAAC had an offer on the table to resume services at the time the district court rendered its decision, the district court was certainly entitled to conclude, on the evidence before it, that CSAAC would not stand by its offer. Among other things, CSAAC had stopped providing services on its own initiative, had made an offer to resume providing services only to retract that offer the next day, and then had made another offer but with new conditions.

What was in error was the district court's conclusion that, upon a finding of unavailability, it should, pursuant to section 1415(j), seek out alternative placements by ordering the School Board to propose such. By its terms, section 1415(j) does not impose any affirmative obligations on a school board; rather, it is totally prohibitory in nature. Moreover, section 1415(j) makes no exception for cases in which the "then-current educational placement" is not functionally available. In other words, the question of availability is entirely irrelevant to the task of identifying the child's then-current educational placement, and it is only the current placement, available or unavailable, that provides a proper object for a "stay put" injunction. Order-

ing the child to enter an alternative placement, as the district court did here, causes the child not to remain in his or her then-current educational placement, a result that contravenes the statutory mandate and turns the statute on its head by transforming a tool for preserving the status quo into an implement for change.

We find further support for this interpretation in the other provisions of section 1415. The district court's order effectively required the School Board to come forward with an alternative interim placement for Daniel. Congress clearly knew how to provide for the placement of a child in an interim alternative educational setting when it deemed such warranted. *See* 20 U.S.C. § 1415(k)(2) (granting a hearing officer the authority to place a child in an "appropriate interim alternative educational setting" if, *inter alia*, the public agency demonstrates that "the current placement of such child is substantially likely to result in injury to the child or to others"). Given Congress' authorization of interim alternative educational settings in other parts of section 1415, it is telling that a district court is not vested with authority under section 1415(j) to order placement in such, except in the limited circumstances delineated in section 1415(k)(7), which are not here applicable.

In those cases where the then-current placement is functionally unavailable, the fact that parties such as the Wagners may not benefit from a section 1415(j) injunction does not mean that they are without remedy. First, section 1415(j) allows the parties to effect a change in placement simply by agreeing upon the new placement. *See* 20 U.S.C. § 1415(j) (providing that the child shall remain in the then-current educational placement "unless the State or local educational agency and the parents otherwise agree"). Second, when agreement cannot be reached, a party may seek a preliminary injunction from the district court, changing the child's placement. Under section 1415(i)(2)(B)(iii), the district court is empowered "[i]n any action brought under this paragraph" to "grant such relief as the court determines is appropriate." *Id*. § 1415(i)(2)(B)(iii). As the Supreme Court stated in *Honig* v. *Doe*, 484 U.S. 305 (1988), this means that the court has the equitable power to order a change in placement upon a sufficient showing. *See id*. at 327-28 (interpreting the "stay put" provision of the EHA). The difference between section 1415(j) and section 1415(i)(2)(B)(iii) is that any preliminary injunction entered under sec-

tion 1415(i)(2)(B)(iii) is by no means automatic. The party seeking such an injunction bears the burden of demonstrating entitlement to such relief under the standards generally governing requests for preliminary injunctive relief. That more is required to effect a change in placement pursuant to section 1415(i)(2)(B)(iii) than the maintenance of placement pursuant to section 1415(j) is consistent with the presumption created by Congress that a child should remain in the then-current educational placement. *See id.* at 328. But the availability of the section 1415(i)(2)(B)(iii) safety-valve is also consistent with the understanding that circumstances do exist where maintaining the child in the then-current educational placement would cause irreparable harm. *Cf. id.* at 328 (stating that the "stay put" provision of the EHA "effectively creates a presumption in favor of the child's current educational placement which school officials can overcome only by showing that maintaining the child in his or her current placement is substantially likely to result in injury either to himself or herself, or to others"). District courts should, of course, be extremely cautious when considering whether to order a change in a child's placement under section 1415(i)(2)(B)(iii), given the statute's strong presumption, expressed in section 1415(j), in favor of the status quo and its provision for administrative hearing before adjudication in federal court. *See id.* at 327.

With that understanding of section 1415(j), we return to the district court's decision. It is clear that the district court did not follow the proper procedures. When presented with an application for a "stay put" injunction, the district court should have entered an order maintaining the child in the then-current education placement, whatever the status of that placement. Although it is not at all clear that the Wagners made a showing sufficient to justify the grant of a preliminary injunction changing Daniel's placement, if the Wagners wanted a change, as it appears they did, they should have requested such relief under section 1415(i)(2)(B)(iii).

Because the district court's orders were based upon an incorrect interpretation of the IDEA, we vacate both of the orders, and remand for further proceedings consistent with this opinion.*

---

*The Board argues that the Wagners' request for "stay put" relief has been rendered moot by their unilateral placement of Daniel in the Autistic Learning Center (ALC). It appears, however, that the Wagners were not successful in their attempt to enroll Daniel in ALC, so their "stay put" request still presents a live controversy.

*VACATED AND REMANDED*

WIDENER, Circuit Judge, dissenting:

I respectfully dissent.

I would affirm on the opinion of the district court.