NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0341n.06

Case No. 23-5704

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | |
|---|---|
| J.L., through his parents and guardians S.L. and M.L.; S.L.; M.L., <br><br>     Plaintiffs - Appellants, <br><br> v. <br><br> WILLIAMSON COUNTY, TENNESSEE, BOARD OF EDUCATION, <br><br>     Defendant - Appellee. | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE <br><br> OPINION |

**FILED**
Aug 02, 2024
KELLY L. STEPHENS, Clerk

Before: GIBBONS, WHITE, and THAPAR, Circuit Judges.

GIBBONS, J., delivered the opinion of the court in which THAPAR, J., joined. WHITE, J. (pp. 24–29), delivered a separate dissenting opinion.

JULIA SMITH GIBBONS, Circuit Judge. This case concerns whether J.L. has shown entitlement to a stay put injunction under the Individual with Disabilities Education Act (IDEA). The stay put provision mandates that, during the pendency of any due process proceedings conducted under the IDEA, "the child shall remain in the then-current educational placement" until resolution of the proceedings. 20 U.S.C. § 1415(j). J.L., a minor student with a qualifying emotional disability under the IDEA, who has a pending due process complaint against the Williamson County, Tennessee Board of Education (the "Board"), seeks a judicial determination that the stay put provision entitles him to stay put placement in Williamson County public schools pursuant to his 2019 Individualized Education Program ("2019 IEP"). The Board disagrees, asserting first that the stay put provision does not apply to J.L., and second that if J.L. does have a

stay put placement, it is homebound instruction pursuant to a prior settlement agreement between the parties. We hold that J.L. has failed to show entitlement to a stay put injunction.

I.

A.

The IDEA promises federal funds to states that agree to furnish a free appropriate public education, or FAPE, to children with certain physical or intellectual disabilities. *See* 20 U.S.C. § 1400 *et seq.* At the time of the statute's enactment in 1975, Congress recognized that children with disabilities faced widespread exclusion from public education. *See Honig v. Doe*, 484 U.S. 305, 309 (1988). With the IDEA, Congress aimed to address the inadequate educational services offered to children with disabilities and combat their exclusion from public schools. *See* 20 U.S.C. § 1400(d)(1)(A) (reflecting Congress's goal "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs").

A FAPE consists of both "special education and related services," together, an instruction "specially designed" to address a child's "unique needs" and the "supportive services" necessary to ensure that a child "benefit[s] from" his special education. *Id.* §§ 1401(9), (26), (29). When a state accepts funding under the IDEA, "[a]n eligible child . . . acquires a 'substantive right'" to a FAPE. *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 158 (2017) (quoting *Smith v. Robinson*, 468 U.S. 992, 1010 (1984)).

The IDEA contemplates that children with a wide array of impairments—including, as relevant here, "serious emotional disturbance[s]," 20 U.S.C. § 1401(3)(A)(i)—will receive a FAPE in the least restrictive environment, or LRE. *Id.* § 1412(a)(5). The LRE is the educational setting that, "[t]o the maximum extent appropriate," educates children with disabilities alongside

non-disabled children, removing such children from the general education setting "only when the nature or severity of [a child's disability] is such that education in regular classes . . . cannot be achieved satisfactorily." *Id.* § 1412(a)(5)(A). In imposing the LRE requirement, Congress exercised its policymaking prerogative to underscore the importance of incorporating children with disabilities into regular education classes wherever possible.

The "primary vehicle" for implementing a FAPE is the individualized educational program, or IEP. *Honig*, 484 U.S. at 311; *see also* 20 U.S.C. § 1412(a)(4), 1414(d)(2). Developed by a child's "IEP Team," a collection of parents, teachers, and school officials, the IEP is a "written statement" that identifies the child's particular educational needs, sets measurable goals for the child's progress, creates a plan for meeting those goals, and outlines the supplementary aids and services the child needs to meet those goals. *Id.* §§ 1414(d)(1)(A), (B). The IEP Team develops a child's IEP by considering the child's strengths, the parents' concerns, the results of the child's initial or most recent evaluation, and the child's academic, developmental, and functional needs. *Id.* § 1414(d)(3)(A). The IEP Team must review a child's IEP at least annually. *Id.* § 1414(d)(4)(A)(i). IEPs, moreover, are effective only for set periods—a school year or semester, for example. This limited duration makes sense; young children develop quickly, and changing needs often require different educational environments. Usually, the same team that developed the original IEP cooperates to establish the next one. *See* 34 C.F.R. § 300.116.

The IDEA also establishes various procedural safeguards "to guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education," including input into the IEP, "and the right to seek review of any decisions they think inappropriate." *Honig*, 484 U.S. at 311–12; *see generally* 20 U.S.C. § 1415. These procedural safeguards include the parents' right to examine their child's records and participate in meetings concerning their child's

education, *id.* § 1415(b)(1), to receive prior written notice about any change in the child's identification, evaluation, educational placement, or FAPE, *id.* § 1415(b)(3), and to file an administrative due process complaint relating to the child's identification, evaluation, educational placement, or FAPE, *id.* § 1415(b)(6). Filing a due process complaint triggers the opportunity for an impartial due process hearing, conducted by the state or local educational agency, *id.* § 1415(f)(1)(A), which results in a final decision appealable to state or federal court. *Id.* § 1415(i)(2)(A).

IDEA's stay put provision is one of the procedural safeguards afforded upon the initiation of a due process complaint. Section 1415(j) of the Act, "Maintenance of current educational placement," states that "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child *shall remain in the then-current educational placement* of the child[.]" *Id.* § 1415(j) (emphasis added). The provision represents Congress's policy determination that "regardless of whether their case is meritorious or not," children with disabilities must remain in their then-current educational placement until the dispute is resolved. *Drinker ex rel. Drinker v. Colonial Sch. Dist.*, 78 F.3d 859, 864 (3d Cir. 1996).

B.

Plaintiff J.L. is a fourteen-year-old student living in Williamson County, Tennessee. Since preschool, J.L. has qualified as a student with a disability under the IDEA. J.L.'s qualifying disability, based on diagnoses of Disruptive Mood Dysregulation Disorder ("DMDD") and Attention Deficit Hyperactive Disorder ("ADHD"), is "emotional disturbance."

J.L.'s formal schooling began in Williamson County's public schools, and from second through fourth grade, J.L. attended Bethesda Elementary. J.L.'s last-implemented IEP, drafted in

anticipation of his fourth grade (2019-20) school year, reflects this placement. J.L.'s 2019 IEP dictated that he would receive schooling in both the general and special education settings, with behavioral supports accompanying him when he was among non-disabled students. The IEP also set forth an assessment of J.L.'s "present levels of performance" across several academic and behavioral metrics and his goals, benchmarks, and objectives for the fall 2019 semester. DE 5-3, 2019 IEP, Page ID 365–77. Reflecting the findings of both his educators and his medical professionals, J.L.'s 2019 IEP described his social and emotional behavior in the general education setting as "escalating." *Id.* at 371; *see also* DE 1, Compl., Page ID 5 (admitting J.L.'s "history of episodes of aggression, hitting, running [i.e., eloping], and verbal outbursts" at school). Specifically, the IEP described "verbal and physical outburst[s]," including kicking furniture and throwing chairs and other items. DE 5-3, 2019 IEP, Page ID 371.

In October 2019, J.L.'s physical aggression and elopement from school led the Board to propose a new IEP, which would have placed J.L. in a publicly-funded therapeutic classroom designed to provide "a wrap-around approach [that] decrease[d] significant problem behaviors, with the goal of transitioning [J.L.] back to a less restrictive setting." DE 5-12, ALJ Order, Page ID 394. Disagreements over this proposed placement, however, led J.L.'s parents to file an IDEA due process complaint. And while that due process action was pending, J.L.'s problem behaviors escalated. In the spring of 2020, the Board therefore filed a due process action of its own, seeking J.L.'s immediate removal from the general education setting under 20 U.S.C. § 1415(k)(3). The district sought J.L.'s removal, a remedy known as a *Honig* injunction, due to the substantial likelihood that J.L.'s behavior would injure himself and others. In its complaint, the Board described escalating behavior in early 2020, alleging that J.L. had injured Bethesda Elementary teachers and staff, destroyed a laptop, and eloped off school property.

In June 2020, the parties reached a settlement agreement (the "2020 *Honig* Settlement") that resolved the Board's due process proceeding in its entirety. J.L.'s parents agreed to place J.L. in a homebound setting, and the Board agreed to provide publicly-funded instruction there for three hours a week. While the 2020 *Honig* Settlement did not resolve the merits of J.L.'s due process action, the parties agreed that J.L.'s homebound placement "resolve[d] the issues between them" concerning J.L.'s stay put rights for the duration of his due process suit. DE 5-6, 2020 *Honig* Settlement, Page ID 75.

In the fall of 2020, J.L.'s parents identified a private school, Robson Academy, for J.L.'s continued education. The parties settled J.L.'s 2019 due process complaint, and the Board agreed to reimburse J.L.'s parents for expenses arising from his attendance at Robson, a common approach under the IDEA. *See* 20 U.S.C. § 1412(a)(10)(B)(i); 34 C.F.R. § 300.325(c). But unlike their earlier *Honig* Settlement, the parties expressly disclaimed any notion that their "Robson Agreement" created a stay put placement under the IDEA.

J.L.'s tenure at Robson was short-lived, marked by "flipping tables, ripping paper, swearing, fleeing [the] classroom and hitting the teachers." DE 8-7, Proposed 2021 IEP, Page ID 245. In the spring of 2021, after attempting to work with J.L., Robson Academy decided that J.L. was no longer welcome. J.L.'s parents then enrolled him in an online homeschool program for the remainder of 2020-21 school year.

In August 2021, J.L.'s parents hoped to re-enroll J.L. in the Williamson County public school system. In anticipation of J.L.'s re-enrollment, the parties attended a series of IEP Team meetings that month, but they could not devise a mutually agreeable approach to J.L.'s education. So on August 18, 2021, J.L. filed a second due process complaint, and J.L. was homeschooled for the duration of the 2021-22 school year.

J.L.'s parents voluntarily withdrew their second due process complaint in March 2022, and at the beginning of the 2022-23 school year, J.L.'s parents enrolled J.L. at a second private school, Galileo Academy. By November 2022, however, J.L.'s parents had withdrawn him from Galileo. And in December 2022, J.L.'s parents attempted to enroll J.L. in the Williamson County public school system once more. J.L.'s IEP Team again convened and again failed to reach a mutually agreeable approach to his schooling. So in March 2023, J.L.'s parents filed a third due process complaint, the basis of this appeal before us, alleging that the Board's plan denies J.L. a free appropriate public education in the least restrictive environment.

The matter went to a hearing before a Tennessee Department of Education ALJ, who found in favor of the Board on J.L.'s claims. Although her decision on the merits rendered J.L.'s stay put rights moot, the ALJ's order nonetheless discussed, and rejected, J.L.'s contention that he had stay put rights to placement within the general education setting of a Williamson County public school. Dismissing J.L.'s argument as "illogical," the ALJ found that J.L.'s 2019 IEP placement at Bethesda Elementary could not serve as a basis for stay put rights where J.L. had since graduated from elementary to middle school and where J.L.'s parents had "unilaterally placed him in a private school . . . immediately prior to re-enrolling him with [Williamson County Schools]." DE 5-12, ALJ Order, Page ID 161–62. This latter action, the ALJ further found, constituted a waiver of J.L.'s stay put rights.

J.L. filed a complaint in federal district court challenging the ALJ's order. He then moved for a temporary restraining order and preliminary injunction to "enforce" his stay put rights by mandating his return to the regular education classroom with his peers. *See* DE 5, Mot. TRO and

Prelim. Inj., Page ID 27–28. The district court denied the initial motion and J.L.'s subsequent motion for reconsideration of that order. J.L. timely appealed both denials.[1]

J.L. then filed with this court a motion for stay put injunction pending appeal. The motions panel denied it, holding that J.L. had not shown likelihood of success on the merits and that the balance of the remaining injunction factors weighed against granting injunctive relief.

## II.

The unique nature of a stay put injunction under 20 U.S.C. § 1415(j) necessitates that we review de novo. Stay put under § 1415(j) functions as an automatic statutory injunction once the plaintiff has made its two-factor showing—(1) a "proceeding[] conducted pursuant to" 20 U.S.C. § 1415 is "pend[ing]," and (2) the child has a "then-current educational placement" in which he must remain. *See id.* § 1415(j); *Davis ex rel. Davis v. District of Columbia*, 80 F.4th 321, 324 (D.C. Cir. 2023) ("A parent is entitled to stay-put relief under § 1415(j) 'upon a two-factor showing that (i) an administrative due process proceeding is pending, and (ii) the local educational agency is attempting to alter the student's then-current educational placement.' . . . If the two preconditions are met, the stay-put provision functions as an automatic statutory injunction[.]" (quoting *Olu-Cole v. E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519, 527 (D.C. Cir. 2019)); *S.C. ex rel. K.G. v. Lincoln Cnty. Sch. Dist.*, 16 F.4th 587, 589 (9th Cir. 2021) ("Stay put functions as an automatic preliminary injunction, and the moving party need not show the traditionally required preliminary injunction factors to obtain relief." (quoting *Joshua A. v. Rocklin Unified Sch. Dist.*, 559 F.3d 1036, 1037 (9th Cir. 2009) (internal quotations omitted)); *Olu-Cole*, 930 F.3d at 527–28 ("[O]nce Olu-Cole's motion for a preliminary injunction demonstrated that the two statutorily required factors

---

[1] This court has jurisdiction to review the district court's interlocutory order denying J.L.'s motion for a temporary restraining order and preliminary injunction pursuant to 28 U.S.C. § 1292(a)(1). *See Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 572 (6th Cir. 2002).

were met, there was a paradigm shift. Stay put locked in [the child's] educational status quo, and the party that needed injunctive relief was the School seeking to derail the statute's ordinary operation."); *Light v. Parkway C-2 Sch. Dist.*, 41 F.3d 1223, 1227 (8th Cir. 1994) (noting that it is the local educational agency's task to "overcome the automatic stay-put injunction"); *see also Honig v. Doe*, 484 U.S. 305, 326 (1988) (noting the Ninth Circuit interpreted the stay put provision as an automatic injunction); *Hatikvah Int'l Acad. Charter Sch. v. E. Brunswick Twp. Bd. of Educ.*, 10 F.4th 215, 218 (3d Cir. 2021) (automatic preliminary injunction); *Tina M. v. St. Tammany Parish Sch. Bd.*, 816 F.3d 57, 60 (5th Cir. 2016) (same); *CP v. Leon Cnty. Sch. Bd. Fla.*, 483 F.3d 1151, 1156 (11th Cir. 2007) (same); *Wagner v. Bd. of Educ. Montgomery Cnty.*, 335 F.3d 297, 301 (4th Cir. 2003) (same); *Casey K. ex rel. Norman K. v. St. Anne Cmty. High Sch. Dist. No. 302*, 400 F.3d 508, 511 (7th Cir. 2005) (Posner, J.) ("The stay-put provision has been interpreted as imposing an automatic statutory injunction[.]"). The school district may attack either or both of these factors.

Here, one of those two factors—J.L.'s "then-current educational placement"—is the sole question of this appeal. This is an issue of statutory interpretation that we review de novo.[2] *N.W. ex rel. J.W. v. Boone Cnty. Bd. of Educ.*, 763 F.3d 611, 615 (6th Cir. 2014).

---

[2] Our sister circuits agree that the application of stay put to a set of facts is reviewed de novo. *See, e.g.*, *Davis ex rel. Davis v. District of Columbia*, 80 F.4th 321, 326 (D.C. Cir. 2023) ("This court reviews . . . de novo a district court's interpretation of the IDEA."); *Hatikvah Int'l Acad. Charter Sch. v. E. Brunswick Twp. Bd. of Educ.*, 10 F.4th 215, 218 (3d Cir. 2021) ("We review de novo the application of the stay-put rule to a given set of facts."); *E.E. ex rel. Hutchinson-Escobedo v. Norris Sch. Dist.*, 4 F.4th 866, 871 (9th Cir. 2021) (reviewing a district court's preliminary injunction order on the student's stay put placement for abuse of discretion, but reviewing the district court's interpretation of the underlying legal principles de novo); *Ventura de Paulino v. N.Y. City Dep't of Educ.*, 959 F.3d 519, 529 (2d Cir. 2020) (applying de novo review to "questions of law decided in connection with requests for preliminary injunction[]" (internal citation omitted)); *Wagner v. Bd. of Educ. Montgomery Cnty.*, 335 F.3d 297, 301 (4th Cir. 2003) ("While we normally review the grant of preliminary injunctive relief for abuse of discretion, we review the district court's interpretation of IDEA de novo."); *Hale ex rel. Hale v. Poplar Bluffs R-I Sch. Dist.*, 280 F.3d 831, 834 (8th Cir. 2002) (applying de novo review to district court's stay put ruling); *Verhoeven v. Brunswick*

III.

The IDEA does not define the term "then-current educational placement." But *Honig v. Doe*, though it explored a different question than presented here, gives some near-contemporaneous insight into the term. 484 U.S. at 323–28. In *Honig*, the Supreme Court explained that the stay put provision's language is "unequivocal" and states its directive "plainly." 484 U.S. at 323. Consistent with the IDEA's overarching goal of combatting the states' failure to provide disabled children with an appropriate education, the *Honig* Court found that an animating purpose of the stay put provision was to "strip schools of the *unilateral* authority they had traditionally employed to exclude disabled students, particularly emotionally disturbed students, from school." *Id.* at 323, 327 (emphasis in original).

In other words, the stay put provision prohibits schools from unilaterally removing the child or changing his educational placement, over the parent's objection, until the completion of the underlying IDEA litigation. *See id.* at 324; *see also Tenn. Dep't of Mental Health and Mental Retardation v. Paul B.*, 88 F.3d 1466, 1472 (6th Cir. 1996). But *Honig*'s analysis of the provision is a narrow one, as it considered only whether the stay put provision included an implicit exception for schools to remove "dangerous" students. *Honig* did not define any statutory terms or engage in a broader analysis of the provision. And while preventing unilateral removal of a student by school officials is indeed one goal of stay put, it is not the provision's sole purpose. *Honig*, 484 U.S. at 327; *see also M.R. v. Ridley Sch. Dist.*, 744 F.3d 112, 127 (3d Cir. 2014) ("The Supreme Court has not declared protection from unilateral action by school officials to be the *only* purpose of the stay-put provision.") (emphasis in original).

*Sch. Comm.*, 207 F.3d 1, 5 (1st Cir. 1999) (explaining that the determination of educational placement under § 1415(j) is reviewed de novo).

Where *Honig* acknowledged the limitations stay put places on state action, *Schaffer ex rel. Schaffer v. Weast* acknowledged the limitations that stay put places on parental action. 546 U.S. 49 (2005). In discussing the stay put provision, the *Schaffer* Court found that although "Congress could have required that a child be given the educational placement that a parent requested during a dispute, . . . it did no such thing." *Id.* at 59–60. So while schools lack unilateral authority to remove students per *Honig*, parents similarly lack unilateral authority to create the stay put placement of their choice under *Schaffer*. Dissenting from the *Schaffer* majority, Justice Ginsburg nonetheless agreed with this conclusion, writing that stay put "merely preserves the status quo" and does not create an affirmative remedy. *Id.* at 64 n.1 (Ginsburg, J., dissenting). In the context of reimbursement for private education, the Court has further held that "parents who unilaterally change their child's placement during the pendency of [IDEA] review proceedings, without the consent of state or local school officials, do so at their own financial risk." *Sch. Comm. Burlington*, 471 U.S at 373–74. Such parents, the Court held, will only receive reimbursement if a court concludes both that the public placement violated the IDEA and that the private placement was proper. *Id.*; *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 15 (1993). All told, the Court's precedent, while not precisely defining the stay put provision, has noted the limitations that neither the school nor the parents can create a stay put placement unilaterally.

Lacking a statutory definition of "then-current educational placement," a previous panel of this court assigned the phrase its plain meaning and held that the term "connotes preservation of the status quo" and thus "refers to the operative placement actually functioning at the time the dispute first arises." *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 625–26 (6th Cir. 1990). And because an IEP had been created but not implemented for the plaintiff in that suit, the panel

deemed five hours of home education per week—the operative placement actually functioning at the time the dispute arose—to be the "then current educational placement," not the IEP. *Id.* at 626.

Twenty-four years later, a subsequent panel abrogated *Thomas*'s definition of "then current educational placement" when it recognized that the Department of Education had defined "placement" in its regulations since *Thomas* was decided. *N.W.*, 763 F.3d at 617. In *N.W.*, the plaintiff parents became dissatisfied with N.W.'s IEP-dictated school, St. Rita's, and unilaterally placed him at another private school, Applied Behavioral Sciences. *Id.* at 613. The parties later disagreed about whether the school district's plan to transition N.W. into the district's public schools provided a FAPE, and the parties litigated the issue, simultaneously seeking to define N.W.'s stay put rights. *Id.* at 613–14.

Quoting from the Department of Education's regulations, the *N.W.* panel held that a child's placement "(1) [i]s determined at least annually; (2) [i]s based on the child's IEP; and (3) [i]s as close as possible to the child's home." *Id.* at 617 (quoting 34 C.F.R. § 300.116(b)). The panel further noted that the "placement decision . . . [i]s made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options; and . . . [i]s made in conformity with the LRE provisions." *Id.* (quoting 34 C.F.R. § 300.116(a)). Implicit in these definitions, the *N.W.* panel held, was a requirement that a school district approve of an educational setting before it can serve as a child's "placement." *Id.* And based on that requirement, the panel went on, N.W.'s educational placement could not be Applied Behavioral Services, a school unilaterally chosen by N.W.'s parents. *Id.* N.W. countered that it was "logically dubious" for N.W.'s stay put placement to be a public school that N.W. had never attended. *Id.* at 618. But the panel avoided this pitfall, responding that N.W.'s placement was "the last agreed-upon school that N.W. attended: St. Rita's." *Id.*

The *N.W.* panel was correct that agreement from both the parents and the local educational agency is necessary for the stay put provision to apply to a placement, given the principles of *Honig* and *Schaffer*. Still, *N.W.* misses one component—timing. *N.W.* overlooked the "cardinal rule that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 220 (1991) (internal citations omitted). *N.W.* focuses too narrowly on "placement," bypassing the words surrounding it—"the child shall *remain* in the *then-current* educational placement." 20 U.S.C. § 1415(j) (emphasis added); *see also Fed. Commc'n Comm'n v. AT&T Inc.*, 562 U.S. 397, 406 (2011) ("[W]hen interpreting a statute, we construe language in light of the terms surrounding it.") (cleaned up). "Remain" connotes preservation of the status quo; to "remain" is to "continue unchanged." Merriam-Webster Online, https://www.merriam-webster.com/dictionary/remain (last accessed July 31, 2024); *see also Schaffer*, 546 U.S. at 64 n.1 (Ginsburg, J., dissenting); *Olu-Cole*, 930 F.3d at 320; *Verhoeven v. Brunswick Sch. Comm.*, 207 F.3d 1, 3 (1st Cir. 1999). "Then-current" also connotes preservation of the status quo; the child is to "remain" in the educational placement that was "current" "then" — i.e., when the due process proceeding was initiated. *See Rena C. v. Colonial Sch. Dist.*, 890 F.3d 404, 415 (3d Cir. 2018), *cert. denied*, 139 S. Ct. 244 (2018). The provision's title—"*Maintenance* of *current* educational placement"—also reflects this emphasis on both the child's present educational situation and the preservation of the status quo. *See Grand Trunk Western R.R. Co. v. U.S. Dep't of Labor*, 875 F.3d 821, 826 n.6 (6th Cir. 2017) ("While the title of a statute and the heading of a section cannot limit the plain meaning of the text,' they can 'assist in clarifying ambiguity.'" (first quoting *Bhd. of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528–29 (1947), second quoting *Minn. Transp. Reg. Bd. v. United States*, 966 F.2d 335, 339 (8th Cir. 1992)).

The provision's legislative history further supports this interpretation. Congress, in enacting the provision, noted that "language is also adopted to require that during the pendency of any administrative or judicial proceedings regarding a complaint . . . the child involved in the complaint shall remain in his or her *present* educational placement." H.R. Rep. No. 94-664, at 48–50 (1975) (emphasis added); S. Rep. No. 94-455, at 48–50 (1975) (same). This evidences Congress's intent that "then-current" means "present," i.e., "now existing or in progress." *See* Merriam-Webster Online, https://www.merriam-webster.com/dictionary/present (last accessed July 31, 2024).

Our sister circuits that have considered the meaning of "then-current educational placement" vary slightly in their interpretations.[3] But a few principles are clear. First, agreement

---

[3] For example, the First Circuit interprets it to mean "the last placement that the parents and the educational authority agreed to be appropriate." *Doe v. Portland Pub. Schs.*, 30 F.4th 85, 91 (1st Cir. 2022). The Second Circuit has a similar definition: The stay put provision "typically refers to the child's last agreed-upon educational program before the parent requested a due process hearing to challenge the child's IEP." *Venture de Paulino v. N.Y. City Dep't of Educ.*, 959 F.3d 519, 532 (2d Cir. 2020). The Second Circuit also provides three factors to consider in determining a child's then-current educational placement: "(1) the placement described in the child's most recently implemented IEP; (2) the operative placement actually functioning at the time when the stay put provision of the IDEA was invoked; or (3) the placement at the time of the previously implemented IEP." *Doe v. East Lyme Bd. of Educ.*, 790 F.3d 440, 452 (2d Cir. 2015) (quoting *Mackey ex rel. Thomas M. v. Bd. of Educ. for Arlington Cent. Sch. Dist.*, 386 F.3d 158, 163 (2d Cir. 2004) (internal quotations omitted). The Third Circuit has explained that "the dispositive factor in deciding a child's current educational placement should be the [IEP] actually functioning when the stay put is invoked." *Rena C.*, 890 F.3d at 415 (quoting *Drinker*, 78 F.3d at 867) (internal quotations omitted). In other words, the operative placement is determined by "the date the dispute between the parents and the school district 'first arises' and proceedings conducted pursuant to the IDEA begin." *M.R.*, 744 F.3d at 124 (quoting *Drinker*, 78 F.3d at 867). Similarly, the Ninth Circuit has interpreted the ordinary meaning of the phrase to be "'the educational setting in which the student is actually enrolled at the time the parents request a due process hearing,' and it 'is typically the placement described in the child's most recently implemented IEP.'" *E.E. ex rel. Hutchison-Escobedo v. Norris Sch. Dist.*, 4 F.4th 866, 871–72 (9th Cir. 2021) (first quoting *N.E. ex rel. C.E. v. Seattle Sch. Dist.*, 842 F.3d 1093, 1096 (9th Cir. 2016), and then quoting *Johnson ex rel. Johnson v. Special Educ. Hearing Off.*, 287 F.3d 1176, 1180 (9th Cir. 2002)). The Seventh Circuit, on the other hand, uses a more "fact-driven approach," defining the parameters of educational placement as "something more than the actual school attended by the child and something less than the child's ultimate educational goals." *Bd. of Educ. of Cmty. High Sch. Dist. No. 218, Cook Cnty., Ill. v. Ill. State Bd. of Educ.*, 103 F.3d 545, 549 (7th Cir. 1996).

between the parents and local educational agency is a critical component of the "then-current educational placement"—a placement cannot be unilateral. *See, e.g.*, *Doe v. Portland Pub. Schs.*, 30 F.4th 85, 91 (1st Cir. 2022); *Venture de Paulino v. N.Y. City Dep't of Educ.*, 959 F.3d 519, 532 (2d Cir. 2020); *see also Wagner*, 335 F.3d at 301; *Digre v. Roseville Schs. Indep. Dist. No. 623*, 841 F.2d 245, 250 (8th Cir. 1988). This tracks *Honig*'s evaluation that the stay put provision prevents unilateral action by schools and *Schaffer*'s evaluation that it prevents unilateral decisions by parents. *See Honig*, 484 U.S. at 323; *Schaffer*, 546 U.S. at 59–60. Second, the last-implemented IEP is relevant to the determination. *See, e.g.*, *Doe v. East Lyme Bd. of Educ.*, 790 F.3d 440, 452 (2d Cir. 2015); *Rena C.*, 890 F.3d at 415; *E.E. ex rel. Hutchison-Escobedo v. Norris Sch. Dist.*, 4 F.4th 866, 872 (9th Cir. 2021). This tracks the regulations defining placement. *See* 34 C.F.R. § 300.116(b). Third, timing is critical. Some circuits define the relevant juncture as the moment when a due process complaint is filed, *see, e.g.*, *Rena C.*, 890 F.3d at 415; *E.E.*, 4 F.4th at 872, while others point to the last agreed-upon placement *before* the dispute arose, *see, e.g.*, *Doe v. Portland*, 30 F.4th at 91; *Venture de Paulino*, 959 F.3d at 532. This tracks the statutory text's references to timing. *See* 20 U.S.C. § 1415(j) (mandating that the child shall "*remain* in the *then-current* educational placement*") (emphasis added). While this timing distinction in our sister circuit's case law is typically immaterial, the distinction matters here, where the last agreed-upon placement is not the same one that was actually functioning at the time J.L.'s parents brought the due process complaint.

The Board argues J.L. has failed to show entitlement to a stay put injunction, because at the time of the due process filing, he had no "then-current educational placement" to "remain" in. *See* CA6 R. 21, Appellee Br., at 12–16. This is because J.L.'s parents unilaterally changed his educational placement from the homebound instruction that the parties agreed on. *Id.* at 12. J.L.

argues in response that parents do not forfeit their rights by acting unilaterally and choosing a placement without the local educational agency's agreement. *See* CA6 R. 24, Appellant Reply Br., at 2–8. The motions panel, in considering these arguments, "avoid[ed]" the Board's position, as it found that the Board's "arguments that stay-put placement 'no longer applies' debatable at this stage in light of the precedent on which it relies." CA6 R. 18, Order, at 4, 6.

Indeed, Sixth Circuit precedent is at best murky on this question. No Sixth Circuit case has found that a plaintiff failed to show entitlement to a stay put injunction. *N.W.* gives mixed signals on the question. *N.W.* began its discussion of stay put with the section title, "The IDEA's 'Stay-Put' Provision Does Not Apply to N.W.," seeming to indicate the possibility that a plaintiff may fail to prove entitlement to a stay put injunction. 763 F.3d at 616. But then, in responding to N.W.'s counterarguments, the court stated that N.W.'s placement for purposes of the stay put provision was St. Rita's, the last agreed-upon school that N.W. attended. *Id.* at 618. Then, the conclusion doubled back, stating that "N.W. does not qualify for stay-put protection . . . because his parents unilaterally enrolled him in ABS without the District's approval." *Id.*

And the other cases that the Board relies on—*Stockton ex rel. Stockton v. Barbour County Board of Education*, 884 F. Supp. 201 (N.D.W. Va. 1995), and *Michael C. ex rel. Stephen C. v. Radnor Township School District*, 202 F.3d 642 (3d Cir. 2000)—are distinguishable for the reasons identified by the motions panel. *Stockton*'s statement that the child had no current educational placement was undermined by its conclusion that stay put applied to the private school he unilaterally enrolled in. *Stockton*, 884 F. Supp. at 206–07. Indeed, that conclusion actually conflicts with the universal principle among the circuits and the IDEA that a placement requires agreement from both the parents and the local educational agency. And *Michael C.* dealt with an

interstate move prior to Congress's amendment of the IDEA providing specific procedures for interstate transfers. *See Michael C.*, 202 F.3d at 646–47, 649–52; 20 U.S.C. § 1414(d)(2)(C)(i)(II).

It is rare (but not entirely unheard of) for a court to find that a plaintiff has failed to prove entitlement to a stay put injunction. The Ninth Circuit has held in one case that stay put rights did not attach to a child whose parents unilaterally chose a private program. *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 911 (9th Cir. 2009). But that case differs from J.L.'s because the child never had an implemented IEP, and the child was making his initial application to attend a public school. *See id.* Similarly, the D.C. Circuit has also held that the stay put provision did not apply to the facts of a particular child's case, but that was because the District of Columbia was unable to provide an appropriate placement due to factors outside of its control. *Davis*, 80 F.4th at 327.

While it is rare to find that a plaintiff has failed to show entitlement to a stay put injunction, this is a rare case. The 'typical' case occurs when "a school district attempts to change a student's placement, the student objects to the change by filing an administrative complaint, and stay put mandates the placement until the dispute ends." *A.D. ex rel. L.D. v. Hawaii Dep't of Educ.*, 727 F.3d 911, 914 (9th Cir. 2013). On the other hand, here, J.L. has failed to demonstrate that he has a "then-current educational placement" to remain in.

The statutory provision, applied to J.L.'s case, requires that during the pendency of the most recent due process proceeding, filed on March 2, 2023, J.L. "shall remain in [his] then-current educational placement." *See* 20 U.S.C. § 1415(j); DE 5-10, DP Compl. 07.03-231153J, Page ID 413–21. But at the time J.L.'s parents filed the March 2023 due process proceeding, J.L. attended neither a Williamson County school nor a private school. If our sister circuits are correct in their interpretation of the stay put provision as implementing the educational placement actually

functioning when the due process complaint is filed, *see, e.g.*, *Rena C.*, 890 F.3d at 415; *E.E.*, 4 F.4th at 872, there is none here: There was no agreed-upon educational placement actually functioning when J.L. filed his due process complaint. Moreover, even if "educational placement" means the "last agreed-upon school that [J.L.] attended," as *N.W.* implies, that placement—either homebound under the 2020 *Honig* Settlement or in the general educational setting under the 2019 IEP—was not "current" "then," at the time of the due process complaint filing. *See N.W.*, 763 F.3d at 618. The 2019 IEP, by its terms, expired on December 3, 2019. J.L. has not attended a Williamson County public school since that time. And while J.L.'s parents and the Board created a stay put placement via the 2020 *Honig* Settlement,[4] that placement is also no longer effective, as it expired by its terms with the Robson Agreement.

Applying the policy of the stay put provision is similarly unsatisfactory. The stay put provision, above all, intends to preserve the status quo. *See Schaffer*, 546 U.S. at 64 n.1 (Ginsburg, J., dissenting); *C.K. ex rel. Bd. of Educ. of Sylvania City Sch. Dist.*, 2022 WL 4116491, at *25 (6th Cir. 2022) (quoting *Doe v. East Lyme*, 790 F.3d at 453); *Thomas*, 918 F.2d at 625–26; *Davis*, 80 F.4th at 329; *Olu-Cole*, 930 F.3d at 524; *Doe v. Portland*, 30 F.4th at 91 (quoting *Verhoeven*, 207 F.3d at 3); *Rena C.*, 890 F.3d at 415 (quoting *Drinker*, 78 F.3d at 867); *M.R.*, 744 F.3d at 118. As

---

[4] The *Honig* settlement agreement unambiguously anticipated its use as a stay put placement. *See* 20 U.S.C. § 1415(j) (creating an exception to the stay put provision when "the State or local educational agency and the parents otherwise agree"); *N.W.*, 763 F.3d at 618 (implicitly recognizing that a resolution in a settlement agreement can create an operative stay put placement); *see also K.D. ex rel. C.L. v. Dep't of Educ., Hawaii*, 665 F.3d 1110, 1119 (9th Cir. 2011) (implicitly recognizing that a settlement agreement could create a stay put placement); *Casey K.*, 400 F.3d at 512 (same); *Verhoeven*, 207 F.3d at 10 (same). The *Honig* settlement explicitly stated that it resolved the Board's March 6, 2020, due process complaint, and that it "[did] not apply" to J.L.'s November 3, 2019, due process complaint, "*except as to its stay-put injunction*." DE 5-6, 2020 *Honig* Settlement, Page ID 75. The agreement went on to clarify that it "resolves the issues between [the parties] concerning the stay-put placement of J.L. during the pendency of the due process matter" created by J.L.'s November 3, 2019, due process complaint. *Id.* By explicitly agreeing in the 2020 *Honig* Settlement to "resolve the issues between them concerning the stay-put placement of J.L.," J.L. and the Board created a stay put placement. *See* 20 U.S.C. § 1415(j).

the ALJ noted, J.L.'s last agreed-upon IEP was created in 2019, when J.L. was in the fourth grade. J.L. is now in eighth grade. None of the intervening due process complaints, from 2019 to 2022, were adjudicated, meaning no stay put rights have been created by judicial order. J.L.'s parents and the Board have been unable to agree on revisions to J.L.'s IEP as required by statute. *See* 20 U.S.C. § 1414(d)(4)(A). Since 2019, J.L. has not been in the general educational setting, but in unilateral private placements consisting of mostly one-on-one educational settings. There is no status quo to preserve—J.L. has cycled through three unilateral private placements since 2020.[5]

The IDEA is not supposed to function this way. Federal regulations enforcing that statute give clear directives to ensure a child's placement remains current. Relevant here, the school "must ensure" that the child's placement is determined at least annually and based on an IEP. *See* 34 C.F.R. § 300.116(b)(1)–(2). The Board in this case has failed to meet that obligation; J.L. has not had a placement since, at the very latest, 2020. Nor has he had a functioning IEP since December 2019—another unmet IDEA mandate. *See* 20 U.S.C. § 1414(d)(2)(A). But fault does not lie entirely with the Board. Federal regulations also require "the parents" to play a role in the "placement decision." *Id.* § 300.116(a)(1). Thus, both school and parent have a legal obligation to establish the child's IEP.

---

[5] J.L. argues on appeal that stay put is not "waivable," (*i.e.*, that stay put cannot be forfeited), and points to the motions panel's statement that "[t]he ALJ's conclusion that 'the parents waived the IDEA's stay put provision by unilaterally placing J.L. in a private school' appears to take out of context our statement that 'it is logically dubious to stay in a school that [a child] ha[s] never attended.'" CA6 R. 18, Order, at 5 (quoting *N.W.*, 763 F.3d at 618). In other words, the motions panel cast doubt on the application of forfeiture to the stay put provision. But it is one thing to say that the parents forfeited the stay put protections and another to say that J.L. has failed to prove entitlement to a stay put injunction. If the child has no "then-current educational placement" to "remain" in, that is not forfeiture of a right—he has failed to show entitlement to the statutory injunction. The stay put provision has a "limited role and operation within the IDEA's overall statutory scheme." *Davis*, 80 F.4th at 329. It is a "shield[,] . . . not a sword to effectuate affirmative remedies." *Id.* (internal quotations omitted). If the plaintiff has failed to prove entitlement to a stay put injunction, there is no forfeiture.

These legal obligations and resulting agreement between the parents and the school are central to the stay put provision and the IDEA more broadly. The touchstone of the stay put provision is neither a FAPE nor the IEP, which Congress could have mandated, but did not. *See Schaffer*, 546 U.S. at 64 n.1 (Ginsburg, J., dissenting) ("True, Congress did not require that a child be given the educational placement that a parent requested during a dispute. But neither did Congress require the IEP advanced by the school district go into effect during the pendency of a dispute."); *see also Davis*, 80 F.4th at 328 ("[T]he IDEA's substantive guarantee is not necessarily realized through the procedural safeguard of § 1415(j)."). Instead, the touchstone is agreement. Supreme Court decisions have highlighted the importance of agreement between the parents and the educators in the context of the stay put provision. *See, e.g.*, *Honig*, 484 U.S. at 323, 327; *Sch. Comm. Burlington*, 471 U.S at 373–74. Indeed, the stay put provision itself makes an exception for an alternative agreement among the parents and educators, stating "during the pendency of [the] proceedings . . . *unless the State or local educational agency and the parents otherwise agree*, the child shall remain . . . ." 20 U.S.C. § 1415(j) (emphasis added); *see also Rena C.*, 890 F.3d at 417 (explaining that a school district's agreement to pay for private school tuition constitutes an agreement to placement and triggers the child's stay put rights). Other provisions of the IDEA also create the option for parents and educators to agree on placement outside of the typical IEP process, which demonstrates the importance of agreement between parents and educators to the overall statutory scheme. *See, e.g.*, 20 U.S.C. § 1415(e) (providing for mediation between the parties that may result in "a legally binding agreement" resolving the parties' dispute on "any matter," presumably including stay put rights). Finally, other circuits have noted the importance of agreement between the parents and the educators for stay put. *See, e.g.*, *Doe v. Portland*, 30 F.4th at 91; *Venture de Paulino*, 959 F.3d at 532. Here, there has not been agreement between

J.L.'s parents and Williamson County on an educational approach since the 2020 *Honig* Settlement.

J.L. argues that his stay put placement is a combination of general education and special education at Williamson County public schools pursuant to the 2019 IEP. CA6 R. 21, Appellant Br., at 23, 29, 35. There are two strengths to this argument. First, if "placement" in the stay put provision refers to a placement based on the child's IEP and determined at least annually, *see* 34 C.F.R. § 300.116(b)(1)–(2), that could favor designation of the 2019 IEP as the stay put placement. We note, however, that that IEP was drafted in 2019, creating a near five-year interval since the last "annual[]" determination and cutting against this requested placement. Second, many circuits which have considered the meaning of "then-current educational placement" have held that the last-implemented IEP is relevant to the determination. *See, e.g.*, *Doe v. East Lyme*, 790 F.3d at 452; *Rena C.*, 890 F.3d at 415; *E.E.*, 4 F.4th at 872.

Still, J.L.'s argument is unpersuasive. To begin, the 2019 IEP as stay put does not fit the statutory language of § 1415(j). As discussed above, it expired on December 3, 2019. The 2019 IEP was not a "then-current" educational placement that J.L. could "remain" in for the pendency of the proceedings because it was not "actually functioning" when J.L. filed his due process complaint on March 2, 2023. *See Rena C.*, 890 F.3d at 415; *E.E.*, 4 F.4th at 872. A general education setting, even with behavioral supports, has not been the status quo since early 2020. *See Schaffer*, 546 U.S. at 64 n.1 (Ginsburg, J., dissenting); *Davis*, 80 F.4th at 329; *Olu-Cole*, 930 F.3d at 524; *Doe v. Portland*, 30 F.4th at 91 (quoting *Verhoeven*, 207 F.3d at 3); *Rena C.*, 890 F.3d at 415 (quoting *Drinker*, 78 F.3d at 867); *M.R.*, 744 F.3d at 118. So if, as here, no IEP is functioning when the operative dispute arises, the last IEP is not dispositive. *See* 34 C.F.R. § 300.116(b)(2) (placement is "*based on* the child's IEP" (emphasis added)). And because J.L.'s team gave his

2019 IEP a limited term of operation, we must do the same. *Cf. Diamond v. Michigan*, 431 F.3d 262, 267 (6th Cir. 2005) (similar stay-put provision of the Rehabilitation Act "only applies to services under an *extant* IPE [individualized plan for employment]" (emphasis added)).

Nor was the 2019 IEP the last agreed-upon educational placement. *See N.W.*, 763 F.3d at 618; *see also Doe v. Portland*, 30 F.4th at 91; *Venture de Paulino*, 959 F.3d at 532. As discussed above, the 2020 *Honig* Settlement, dated June 26, 2020, is certainly more "current" than the 2019 IEP.

True, the IDEA regulations define placement as determined at least annually, based on the child's IEP, and as close as possible to the child's home. *See* 34 C.F.R. § 300.116(b). But the regulations also note that the placement decision "[i]s made by a group of persons, including the parents," thus emphasizing agreement between the parents and local educational agency. *See id.* § 300.116(a)(1). As discussed above, there has been no agreement here between J.L.'s parents and the Board since 2020. And as the Board rightly argues, the regulation's definition of "placement" refers to the typical IEP process and does not cover all uses of the term "placement" in the IDEA or its regulations. *See, e.g.*, 20 U.S.C. § 1415(k)(1) (describing the procedures for "[p]lacement in [an] alternative educational setting"); 20 U.S.C. § 1415(k)(3)(B) (giving hearing officers the authority to "order a change in placement of a child . . . to an appropriate interim alternative educational setting"); 34 C.F.R. § 300.518(d) (allowing a decision favorable to the parents during the administrative review process to be treated as a placement that is an agreement between the state and parents). While the regulation's definition of "placement" and the stay put provision's "then-current educational placement" may typically line up, *see A.D.*, 727 F.3d at 914, they do not in this rare case.

In support of his argument that the 2019 IEP is his stay put placement, J.L. insists on strict application of *N.W.*—that his stay put placement is the "last agreed-upon" educational setting, notwithstanding the parties' qualifications to that agreement. *See N.W.*, 763 F.3d at 617–18. Indeed, nothing in *N.W.* requires us to heed the parties' wishes; under *N.W.*'s language, all that matters is agreement. *See id.* at 618. That outcome, however, would discourage flexibility. Sometimes IDEA litigation is unavoidable, and often it is lengthy. *See Sch. Comm. of the Town of Burlington v. Dep't of Educ. of the Commonwealth of Mass.*, 471 U.S. 359, 370 (1985) (lamenting that litigation under the IDEA is "ponderous"). A rigid, agreement-only approach might chill IEP teams from crafting temporary solutions for fear of being locked in later. Thus, it seems best to treat IDEA agreements much like any other contract, allowing the parties to implement solutions tailored to suit the needs of the child. Under that approach, we honor the parties' agreements—including their end dates.

IV.

In sum, we hold that J.L. has failed to show entitlement to the stay put injunction codified at 20 U.S.C. § 1415(j). Our task in this case is not to determine the best outcome for J.L.'s education. Federal judges possess neither the authority nor the expertise to make that call. Courts, moreover, don't have the luxury of crafting a good-for-one-case-only rule. We may not pick and choose which portions of the law and record to apply in pursuit of what is, by our lights, a sensible outcome. Fortunately, however, deciding what is best for J.L. is, by statute, for the people who know him best—his IEP team. We advise that team to heed the IDEA and its accompanying regulations to avoid anomalies like this in the future.

HELENE N. WHITE, Circuit Judge, dissenting. The majority interprets the IDEA—a statute enacted to protect disabled children—in a way that deprives J.L. of an education during the pendency of his years-long due process proceeding. Because such an outcome directly contradicts binding precedent from this circuit, misconstrues the IDEA's language, and undermines the statute's purpose, I dissent.

## I.

The stay-put provision states that, during the pendency of an IDEA due process proceeding, "the child shall remain in the then-current educational placement." 20 U.S.C. § 1415(j). Based on this language, the majority concludes that the stay-put provision has a "timing" element, which forecloses its application to J.L. Maj. op. 13. This interpretation distorts the relevant statutory language and contradicts binding precedent.

The majority conflates "placement" with "enrollment." A "placement" refers to the "act or instance of placing," such as "the assignment of a person to a suitable place." Merriam-Webster Online, https://www.merriam-webster.com/dictionary/placement (last accessed June 3, 2024). For the purposes of stay put, a child's "placement" is designated by a child's IEP and is supposed to be determined "at least annually" by the child's parents and the school district. 34 C.F.R. § 300.116(a)(1), (b)(1)–(2). But whether an individual remains enrolled in their placement has no bearing on whether the placement is still valid. *See N.W. ex rel. J.W. v. Boone Cnty. Bd. of Educ.*, 763 F.3d 617–18 (6th Cir. 2014) (*rejecting* an interpretation tying stay-put placement to the "operative placement actually functioning" (quoting *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 625–26 (6th Cir. 1990))); *but see* Maj. op. 22 (contradicting precedent by applying the "actually functioning" language that this court explicitly abrogated in *N.W.*). Accordingly, a child's stay-put placement does not necessarily coincide with the child's enrollment at that time.

Instead, the key question is whether the IEP's placement from 2019 was "current" at the time J.L.'s parents initiated due-process proceedings.

The majority first says no because the 2019 IEP was set to expire in December of the same year.[1] Maj. op. 21. That is, the majority apparently concludes that stay-put protection applies only before an IEP expires. This interpretation would seriously undermine the IDEA's structure. IEPs are intended to last a year at most, at which point a new IEP is negotiated—frequently during the summer before the new school year begins. When parents and school districts disagree on the terms of a new IEP, due process proceedings frequently follow. *See, e.g.*, *N.W.* 763 F.3d at 613. But under the majority's formulation, parents would be required to file a due process complaint *before* the old IEP expires to maintain stay-put protection. Such a rule would encourage parents to file premature complaints and incentivize school districts to stonewall negotiations until an IEP's expiration date, knowing that the child will lose stay-put protection. The majority concludes that its approach enhances "flexibility," but it instead creates incentives that will make agreement less likely and due process complaints more numerous.[2] Due process proceedings should be a last resort, but the majority's interpretation erases the IDEA's stay-put provision for many who would prefer to spend more time resolving disagreements through negotiation rather than litigation.

---

[1] The majority argues that an IEP should be treated "like any other contract," and thus its expiration date should be read strictly for the purpose of stay put. Maj. op. 24. The problem with this argument is that an IEP is *not* like any other contract, but it is the vehicle through which the IDEA is implemented. As a result, the statute extends an IEP's reach beyond its plain terms. *See, e.g.*, 20 U.S.C. § 1415(k)(1)(D) (requiring a school district to continue pursuing the IEP's goals even if a child is removed from their placement). Consequently, although parents and a school district may "otherwise agree" to a different arrangement, the statute and accompanying regulations favor the IEP in determining the appropriate placement. 34 C.F.R. § 300.116(b)(2).

[2] The majority's interpretation effectively punishes children for the acts of adults. Should the parents and school district fail to ratify a new IEP before the expiration of the old one, it is the *child* who loses their right to an education, potentially for years.

Alternatively, the majority says that a placement must be "actually functioning" to be current.[3] Maj. op. 21. But neither the statute itself nor the relevant regulations state that a stay-put placement must be "actually functioning" to be current. Even more worrisome, this interpretation was explicitly rejected by *N.W.*, our sole on-point precedent on the matter. *See* 763 F.3d at 611.

In *N.W.*, the parents unilaterally withdrew their child from St. Rita's—the placement designated in the IEP—and enrolled him at Applied Behavioral Services ("ABS"), another private school. *Id.* at 613. Because N.W. attended ABS at the time the due process proceedings began, the parents believed that ABS was the child's stay-put placement. *Id.* Accordingly, the parents argued in subsequent due process proceedings that they were entitled to reimbursement for N.W.'s tuition at ABS. *Id.* at 614. The school district disagreed, arguing that, because it had never agreed to N.W.'s placement at ABS, N.W. had no right to reimbursement under stay put. *Id.* This court sided with the school district, reasoning that because the parents had unilaterally enrolled N.W. at ABS, stay put did not grant them reimbursement. *Id.* However, the panel clarified that N.W. would have had a right to stay put at St. Rita's—the school that the parents and school district had agreed to in the last IEP—despite (1) the child not attending that school for four years, (2) the parents sending the child to another private school in the interim, and (3) the school district temporarily

---

[3] The majority argues that stay put no longer applied as soon as J.L.'s parents "unilaterally changed his educational placement." Maj. op. 15. This interpretation has significant negative consequences. As the majority recognizes, "flexibility" is an important interest of the IDEA. *Id.* at 24. Because finding a perfect match can often be difficult with disabled children, parents—like those here, in *N.W.*, and in *Thomas*—frequently experiment with new educational arrangements. Parents do so not out of intransigence, but because they are often desperate to find an arrangement that works best for their disabled child. However, the majority punishes parents who want to try new academic settings, depriving the child of their right to return to their IEP-designated placement should the new arrangement prove unsuccessful. By doing so, the majority hinders flexibility by discouraging parents from exploring alternative educational opportunities. It is one thing to say that the new unilateral placement does not create a new stay put, even if successful; it is quite another to suggest that it erases the protections of the IEP-designated placement.

paying for the child to attend ABS after St. Rita's. *Id.* at 613–14, 618. *N.W.* makes clear that stay put applies to the last placement agreed upon by the parents and school district—generally contained within the last IEP—but not to stopgap agreements. *Id.* at 618. Importantly, *N.W.* did not link stay-put protection to the child's enrollment at the time of the due process complaint. *Id.*

The majority's reasons for disregarding *N.W.* do not hold up. First, the majority finds *N.W.* unpersuasive, arguing that *N.W.* misread the statute. *See* Maj. op. 13–14. But this conclusion ignores *N.W.*'s precedential impact. Even in circumstances where a panel "would encourage our court to take another look at our precedent," it still "must follow our binding precedent on the issue." *Loc. 1982, Int'l Longshoremen's Ass'n v. Midwest Terminals of Toledo, Int'l, Inc.*, 944 F.3d 607, 613 (6th Cir. 2019) (Thapar, J., concurring); *see also Hopper v. Phil Plummer*, 887 F.3d 744, 752 n.3 (6th Cir. 2018) (explaining that a panel may not "re-evaluate" a rule from the circuit when it is "bound by precedent"). The majority impermissibly relegates *N.W.* to the dustbin.

Second, the majority believes that *N.W.*'s language is contradictory, giving "mixed signals" that undermine the precedent's applicability. Maj. op. 16–17. However, *N.W.* is internally consistent when the opinion's language is read in context. In declaring that stay put did not apply, the *N.W.* panel simply expressed that stay put did not grant N.W.'s parents the remedy they sought—reimbursement for ABS's tuition expenses. *N.W.*, 763 F.3d at 618. Because the parents did not want N.W. to attend St. Rita's, they never invoked stay put for that purpose. Consequently, *N.W.* explains that although stay put did not apply to N.W.'s case—because the parents sought reimbursement for a placement made unilaterally—it would have applied had they invoked stay put differently. *Id.*

The majority applies *Thomas* instead of *N.W.*, a case that *N.W.* explicitly abrogated. 763 F.3d at 618 ("The *Thomas* court's approach may have been correct in 1990, but the Department

of Education's promulgation of § 300.116 renders that interpretation obsolete."). Because I believe *N.W.* governs the outcome of the case here, I disagree with the majority's departure from our precedent.[4] Accordingly, I would conclude that J.L.'s stay-put placement is the one last agreed upon by the parents and the school district in the 2019 IEP.[5]

---

[4] In its discussion, the majority elevates cases from other circuits over our own. Even so, numerous circuits have rejected the majority's interpretation. *See, e.g.*, *Doe v. Portland Pub. Sch.*, 30 F.4th 85, 91 (1st Cir. 2022) (holding that stay put applies to the "last placement that the parents and the educational authority agreed to be appropriate" (quoting *Verhoeven v. Brunswick Sch. Comm.*, 207 F.3d 1, 3 (1st Cir. 1999))); *Ventura de Paulino v. New York City Dep't of Educ.*, 959 F.3d 519, 532 (2d Cir. 2020) (holding that stay put applies to the "last agreed-upon educational program before the parent requested a due process hearing to challenge the child's IEP"); *John M. v. Board of Educ. Of Evanston Twp. High Sch. Dist. 2020*, 502 F.3d 708, 814–15 (7th Cir. 2007) (holding that, where a child's last IEP was implemented years earlier in middle school, and the child was now in high school, the last IEP still governed the stay-put placement, but it must be read at a higher level of generality); *N.E. by and through C.E. and P.E. v. Seattle Sch. Dist.*, 842 F.3d 1093, 1097 (9th Cir. 2016) (holding that the stay-put provision refers to the "placement set forth in the child's last implemented IEP" (quoting *K.D. ex rel. C.L. v. Dep't of Educ.*, 665 F.3d 1110, 1117–18 (9th Cir. 2011))).

The majority relies heavily on precedent from the Third Circuit to argue that stay-put protection only applies to the IEP "actually functioning at the time the dispute first arises." *Rena C. v. Colonial Sch. Dist.*, 890 F.3d 404, 415 (3d Cir. 2018) (quoting *Drinker by Drinker v. Colonial Sch. Dist.*, 78 F.3d 859, 867 (3d Cir. 1996))). This is problematic because the Third Circuit's rule was lifted directly from our circuit's abrogated decision in *Thomas*. *See Drinker*, 78 F.3d at 867 (quoting *Thomas*, 918 F.2d at 625–26). In effect, the majority attempts to circumvent our own case law by pulling language from a court that adopted our circuit's abrogated language. *See id.*

Even if it were proper to defer to Third Circuit precedent, it is not clear that *Drinker* supports the majority's interpretation. In *Drinker*, the child had an IEP for the 1992–93 school year, but the parties could not agree to a new one for 1993 or 1994. *Id.* at 862. The parents initiated due process proceedings in the fall of both 1993 and 1994, but the school district argued that there was no stay-put placement because the old IEP had expired and because an unappealed portion of the state proceedings had set a future placement for the child. *Id.* at 865. Still, the Third Circuit concluded that the expired 1992 IEP governed the child's stay put placement because there was no other valid IEP in place at the time. *Id.* at 867. Rather than deprive the child of stay-put protection, the Third Circuit appeared to default to the most recently implemented IEP because a new placement was not yet in effect. *Id.* at 867. Thus, even under Third Circuit case law, the expiration of J.L.'s IEP would not necessarily deprive him of stay-put protection.

[5] I recognize that it may seem odd to conclude that a four-year-old IEP governs J.L.'s stay-put placement, but that is what our precedent demands. In *N.W.*, the stay-put placement was based on an IEP that was at least four years old. *See N.W.*, 763 F.3d at 613, 618. Although N.W.'s parents agreed to a temporary interim settlement, the agreement explicitly stated that "[n]either party makes an admission as to educational placement." *Id.* at 618. As a result, the *N.W.* panel concluded that the temporary placement could not be used for stay put. *Id.* Here, the parties employed similar limiting language in their settlement agreements. *See* R. 5-6, PID 75 ("The parties agree to place J.L. in a temporary homebound placement until a final order is issued, or until the parties enter into a settlement agreement."); R. 5-7, PID 77 ("The parties agree that this Confidential Settlement Agreement does not create a 'stay-put' placement.").

**II.**

I find it deeply problematic that the majority reads a statute intended to protect the education of disabled children in a way that strips them of protection. J.L.'s current due process complaint was filed in 2023 and may take years to resolve. Yet the majority effectively concludes that the IDEA entitles J.L. to no education at all. This outcome threatens to deprive J.L., a disabled child who should receive a FAPE under the IDEA, of the educational resources he needs in some of the most formative years of his life. Because this outcome is not one intended by the statute, nor one permitted by our binding case law, I dissent.

---

Thus, as in *N.W.*, we must defer to the "last agreed-upon" placement, the 2019 IEP. *N.W.*, 763 F.3d at 618. *N.W.*'s outcome was not unique—other circuits have also deferred to years-old agreements when determining the proper stay-put placement. *See, e.g.*, *Verhoeven*, 207 F.3d at 9 (stay-put placement was determined by a two-year-old IEP, even though the parents and school district agreed to temporarily place the child at a different school in the interim); *Ms. S. ex rel. G. v. Vashon Island Sch. Dist.*, 337 F.3d 1115, 1135 (9th Cir. 2003) (holding that, where a child moved to a new school district, stay-put placement was based on the three-year-old IEP from the old school).